# MISSOURI ET AL. *v.* JENKINS ET AL.

No. 93–1823.   Argued January 11, 1995—Decided June 12, 1995*

---

*Together with *Missouri et al.* v. *Jenkins et al.*, also on certiorari to the same court (see this Court's Rule 12.2).

Rehnquist, C. J., delivered the opinion of the Court, in which O'Connor, Scalia, Kennedy, and Thomas, JJ., joined. O'Connor, J., *post*, p. 103, and Thomas, J., *post*, p. 114, filed concurring opinions. Souter, J., filed a dissenting opinion, in which Stevens, Ginsburg, and Breyer, JJ., joined, *post*, p. 138. Ginsburg, J., filed a dissenting opinion, *post*, p. 175.

*John R. Munich,* Chief Counsel for Litigation, argued the cause for petitioners State of Missouri et al. With him on the briefs were *Jeremiah W. (Jay) Nixon,* Attorney General, *James R. Layton, Michael J. Fields,* and *Bart A. Matanic,*

Assistant Attorneys General, *Carter G. Phillips, Mark D. Hopson,* and *Janet M. Letson.*

*Theodore M. Shaw* argued the cause for respondents. With him on the briefs for respondents Jenkins et al. were *Arthur A. Benson II, James S. Liebman,* and *Elaine R. Jones. Allen R. Snyder, Patricia A. Brannan, John W. Borkowski, Scott A. Raisher,* and *Frederick O. Wickham* filed a brief for respondents Kansas City, Missouri, School District et al.

*Deputy Solicitor General Bender* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Assistant Attorney General Patrick, Irving L. Gornstein, Dennis J. Dimsey,* and *Mark L. Gross.*†

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

As this school desegregation litigation enters its 18th year, we are called upon again to review the decisions of the lower courts. In this case, the State of Missouri has challenged the District Court's order of salary increases for virtually all instructional and noninstructional staff within the Kansas City, Missouri, School District (KCMSD) and the District Court's order requiring the State to continue to fund remedial "quality education" programs because student achievement levels were still "at or below national norms at many grade levels."

---

†*Mark J. Bredemeier* and *Jerald L. Hill* filed a brief for Icelean Clark et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Christopher A. Hansen, Steven R. Shapiro,* and *Helen Hershkoff;* for the Civic Council of Greater Kansas City by *David F. Oliver;* for the Lawyers' Committee for Civil Rights Under Law by *Jack W. Londen, Michael Cooper,* and *Thomas J. Henderson;* and for James D. Anderson et al. by *Kevin J. Hamilton.*

*William L. Taylor* and *Dianne M. Pich* filed a brief for the National Urban League et al. as *amici curiae.*

I

A general overview of this litigation is necessary for proper resolution of the issues upon which we granted certiorari. This case has been before the same United States District Judge since 1977. *Missouri* v. *Jenkins,* 491 U. S. 274, 276 (1989) *(Jenkins I).* In that year, the KCMSD, the school board, and the children of two school board members brought suit against the State and other defendants. Plaintiffs alleged that the State, the surrounding suburban school districts (SSD's), and various federal agencies had caused and perpetuated a system of racial segregation in the schools of the Kansas City metropolitan area. The District Court realigned the KCMSD as a nominal defendant and certified as a class, present and future KCMSD students. The KCMSD brought a cross-claim against the State for its failure to eliminate the vestiges of its prior dual school system.

After a trial that lasted 7½ months, the District Court dismissed the case against the federal defendants and the SSD's, but determined that the State and the KCMSD were liable for an intradistrict violation, *i. e.,* they had operated a segregated school system within the KCMSD. *Jenkins* v. *Missouri,* 593 F. Supp. 1485 (WD Mo. 1984). The District Court determined that prior to 1954 "Missouri mandated segregated schools for black and white children." *Id.,* at 1490. Furthermore, the KCMSD and the State had failed in their affirmative obligations to eliminate the vestiges of the State's dual school system within the KCMSD. *Id.,* at 1504.

In June 1985, the District Court issued its first remedial order and established as its goal the "elimination of all vestiges of state imposed segregation." *Jenkins* v. *Missouri,* 639 F. Supp. 19, 23 (WD Mo. 1985). The District Court determined that "[s]egregation ha[d] caused a system wide *reduction* in student achievement in the schools of the KCMSD." *Id.,* at 24. The District Court made no particularized findings regarding the extent that student achieve-

ment had been reduced or what portion of that reduction was attributable to segregation. The District Court also identified 25 schools within the KCMSD that had enrollments of 90% or more black students. *Id.*, at 36.

The District Court, pursuant to plans submitted by the KCMSD and the State, ordered a wide range of quality education programs for all students attending the KCMSD. First, the District Court ordered that the KCMSD be restored to an AAA classification, the highest classification awarded by the State Board of Education. *Id.*, at 26. Second, it ordered that the number of students per class be reduced so that the student-to-teacher ratio was below the level required for AAA standing. *Id.*, at 28–29. The District Court justified its reduction in class size as

> "an essential part of any plan to remedy the vestiges of segregation in the KCMSD. Reducing class size will serve to remedy the vestiges of past segregation by increasing individual attention and instruction, as well as increasing the potential for desegregative educational experiences for KCMSD students by maintaining and attracting non-minority enrollment." *Id.*, at 29.

The District Court also ordered programs to expand educational opportunities for all KCMSD students: full-day kindergarten; expanded summer school; before- and after-school tutoring; and an early childhood development program. *Id.*, at 30–33. Finally, the District Court implemented a state-funded "effective schools" program that consisted of substantial yearly cash grants to each of the schools within the KCMSD. *Id.*, at 33–34. Under the "effective schools" program, the State was required to fund programs at both the 25 racially identifiable schools as well as the 43 other schools within the KCMSD. *Id.*, at 33.

The KCMSD was awarded an AAA rating in the 1987–1988 school year, and there is no dispute that since that time it has "'maintained and greatly exceeded AAA require-

ments.'"   19 F. 3d 393, 401 (CA8 1994) (Beam, J., dissenting
from denial of rehearing en banc).   The total cost for these
quality education programs has exceeded $220 million.   Mis-
souri Department of Elementary and Secondary Education,
KCMSD Total Desegregation Program Expenditures (Sept.
30, 1994) (Desegregation Expenditures).

The District Court also set out to desegregate the KCMSD
but believed that "[t]o accomplish desegregation within the
boundary lines of a school district whose enrollment remains
68.3% black is a difficult task."   639 F. Supp., at 38.   Be-
cause it had found no interdistrict violation, the District
Court could not order mandatory interdistrict redistribution
of students between the KCMSD and the surrounding SSD's.
*Ibid.;* see also *Milliken* v. *Bradley,* 418 U. S. 717 (1974)
*(Milliken I).*   The District Court refused to order additional
mandatory student reassignments because they would "in-
crease the instability of the KCMSD and reduce the potential
for desegregation."   639 F. Supp., at 38.   Relying on favor-
able precedent from the Eighth Circuit, the District Court
determined that "[a]chievement of AAA status, improve-
ment of the quality of education being offered at the KCMSD
schools, magnet schools, as well as other components of this
desegregation plan can serve to maintain and hopefully at-
tract non-minority student enrollment."   *Ibid.*

In November 1986, the District Court approved a compre-
hensive magnet school and capital improvements plan and
held the State and the KCMSD jointly and severally liable
for its funding.   1 App. 130–193.   Under the District Court's
plan, every senior high school, every middle school, and
one-half of the elementary schools were converted into mag-
net schools.[1]   *Id.,* at 131.   The District Court adopted the

---

[1] " 'Magnet schools,' as generally understood, are public schools of volun-
tary enrollment designed to promote integration by drawing students
away from their neighborhoods and private schools through distinctive
curricula and high quality."   *Missouri* v. *Jenkins,* 495 U. S. 33, 40, n. 6
(1990).

magnet-school program to "provide a greater educational op-
portunity to *all* KCMSD students," *id.*, at 131–132, and be-
cause it believed "that the proposed magnet plan [was] so
attractive that it would draw non-minority students from the
private schools who have abandoned or avoided the KCMSD,
and draw in additional non-minority students from the
suburbs." *Id.*, at 132. The District Court felt that "[t]he
long-term benefit of all KCMSD students of a greater edu-
cational opportunity in an integrated environment is worthy
of such an investment." *Id.*, at 133. Since its inception,
the magnet-school program has operated at a cost, includ-
ing magnet transportation, in excess of $448 million. See
Desegregation Expenditures. In April 1993, the District
Court considered, but ultimately rejected, the plaintiffs'
and the KCMSD's proposal seeking approval of a long-
range magnet renewal program that included a 10-year
budget of well over $500 million, funded by the State and
the KCMSD on a joint-and-several basis. App. to Pet. for
Cert. A–123.

In June 1985, the District Court ordered substantial capi-
tal improvements to combat the deterioration of the KCMSD's
facilities. In formulating its capital-improvements plan,
the District Court dismissed as "irrelevant" the "State's
argument that the present condition of the facilities [was]
not traceable to unlawful segregation." 639 F. Supp., at
40. Instead, the District Court focused on its responsibil-
ity to "remed[y] the vestiges of segregation" and to "imple-
men[t] a desegregation plan which w[ould] maintain and
attract non-minority enrollment." *Id.*, at 41. The initial
phase of the capital-improvements plan cost $37 million.
*Ibid.* The District Court also required the KCMSD to pre-
sent further capital-improvements proposals "in order to
bring its facilities to a point comparable with the facilities in
neighboring suburban school districts." *Ibid.* In Novem-
ber 1986, the District Court approved further capital im-
provements in order to remove the vestiges of racial segre-

gation and "to . . . attract non-minority students back to the KCMSD." App. to Pet. for Cert. A–133 to A–134.

In September 1987, the District Court adopted, for the most part, KCMSD's long-range capital-improvements plan at a cost in excess of $187 million. *Jenkins* v. *Missouri*, 672 F. Supp. 400, 408 (WD Mo. 1987). The plan called for the renovation of approximately 55 schools, the closure of 18 facilities, and the construction of 17 new schools. *Id.*, at 405. The District Court rejected what it referred to as the "'patch and repair' approach proposed by the State" because it "would not achieve suburban comparability or the visual attractiveness sought by the Court as it would result in floor coverings with unsightly sections of mismatched carpeting and tile, and individual walls possessing different shades of paint." *Id.*, at 404. The District Court reasoned that "if the KCMSD schools underwent the limited renovation proposed by the State, the schools would continue to be unattractive and substandard, and would certainly serve as a deterrent to parents considering enrolling their children in KCMSD schools." *Id.*, at 405. As of 1990, the District Court had ordered $260 million in capital improvements. *Missouri* v. *Jenkins*, 495 U. S. 33, 61 (1990) *(Jenkins II)* (KENNEDY, J., concurring in part and concurring in judgment). Since then, the total cost of capital improvements ordered has soared to over $540 million.

As part of its desegregation plan, the District Court has ordered salary assistance to the KCMSD. In 1987, the District Court initially ordered salary assistance only for teachers within the KCMSD. Since that time, however, the District Court has ordered salary assistance to all but three of the approximately 5,000 KCMSD employees. The total cost of this component of the desegregation remedy since 1987 is over $200 million. See Desegregation Expenditures.

The District Court's desegregation plan has been described as the most ambitious and expensive remedial program in the history of school desegregation. 19 F. 3d, at 397

(Beam, J., dissenting from denial of rehearing en banc). The annual cost per pupil at the KCMSD far exceeds that of the neighboring SSD's or of any school district in Missouri. Nevertheless, the KCMSD, which has pursued a "friendly adversary" relationship with the plaintiffs, has continued to propose ever more expensive programs.[2] As a result, the desegregation costs have escalated and now are approaching an annual cost of $200 million. These massive expenditures have financed

> "high schools in which every classroom will have air conditioning, an alarm system, and 15 microcomputers; a 2,000-square-foot planetarium; green houses and vivariums; a 25-acre farm with an air-conditioned meeting room for 104 people; a Model United Nations wired for language translation; broadcast capable radio and television studios with an editing and animation lab; a temperature controlled art gallery; movie editing and screening rooms; a 3,500-square-foot dust-free diesel mechanics room; 1,875-square-foot elementary school animal rooms for use in a zoo project; swimming pools; and numerous other facilities." *Jenkins II*, 495 U. S., at 77 (KENNEDY, J., concurring in part and concurring in judgment).

Not surprisingly, the cost of this remedial plan has "far exceeded KCMSD's budget, or for that matter, its authority to tax." *Id.*, at 60. The State, through the operation of joint-and-several liability, has borne the brunt of these costs. The District Court candidly has acknowledged that it has "allowed the District planners to dream" and "provided the

---

[2] In April 1993, 16 years after this litigation began, the District Court acknowledged that the KCMSD and the plaintiffs had "barely addressed . . . how the KCMSD proposes to ultimately fund the school system developed under the desegregation plan." App. to Pet. for Cert. A–123. In the context of a proposal to extend funding of the magnet-school program for 10 additional years at a cost of over $500 million, the District Court noted that "[t]he District's proposals do not include a viable method of financing any of the programs." *Id.*, at A–140.

mechanism for th[ose] dreams to be realized." App. to Pet. for Cert. A–133. In short, the District Court "has gone to great lengths to provide KCMSD with facilities and opportunities not available anywhere else in the country." *Id.*, at A–115.

## II

With this background, we turn to the present controversy. First, the State has challenged the District Court's requirement that it fund salary increases for KCMSD instructional and noninstructional staff. *Id.*, at A–76 to A–93 (District Court's Order of June 15, 1992); *id.*, at A–94 to A–109 (District Court's Order of June 30, 1993); *id.*, at A–110 to A–121 (District Court's Order of July 30, 1993). The State claimed that funding for salaries was beyond the scope of the District Court's remedial authority. *Id.*, at A–86. Second, the State has challenged the District Court's order requiring it to continue to fund the remedial quality education programs for the 1992–1993 school year. *Id.*, at A–69 to A–75 (District Court's Order of June 17, 1992). The State contended that under *Freeman* v. *Pitts*, 503 U. S. 467 (1992), it had achieved partial unitary status with respect to the quality education programs already in place. As a result, the State argued that the District Court should have relieved it of responsibility for funding those programs.

The District Court rejected the State's arguments. It first determined that the salary increases were warranted because "[h]igh quality personnel are necessary not only to implement specialized desegregation programs intended to 'improve educational opportunities and reduce racial isolation', but also to 'ensure that there is no diminution in the quality of its regular academic program.'" App. to Pet. for Cert. A–87 (citations omitted). Its "ruling [was] grounded in remedying the vestiges of segregation by improving the desegregative attractiveness of the KCMSD." *Id.*, at A–90. The District Court did not address the State's *Freeman* arguments; nevertheless, it ordered the State to continue to

fund the quality education programs for the 1992–1993 school year. See App. to Pet. for Cert. A–70.

The Court of Appeals for the Eighth Circuit affirmed. 11 F. 3d 755 (1993). It rejected the State's argument that the salary increases did not directly address and relate to the State's constitutional violation and that "low teacher salaries d[id] not flow from any earlier constitutional violations by the State." *Id.*, at 767. In doing so, it observed that "[i]n addition to compensating the victims, the remedy in this case was also designed to reverse white flight by offering superior educational opportunities." *Ibid.*; see also 13 F. 3d 1170, 1172 (1993) (affirming the District Court's June 30, 1993, and July 30, 1993, orders).

The Court of Appeals concluded that the District Court implicitly had rejected the State's *Freeman* arguments in spite of the fact that it had failed "to articulate . . . even a conclusory rejection" of them. 11 F. 3d, at 765. It looked to the District Court's comments from the bench and its later orders to "illuminate the June 1992 order." *Id.*, at 761. The Court of Appeals relied on statements made by the District Court during a May 28, 1992, hearing:

> "The Court's goal was to integrate the Kansas City, Missouri, School District to the *maximum degree possible*, and all these other matters were elements to be used to try to integrate the Kansas City, Missouri, schools so the goal is integration. That's the goal. And a high standard of quality education. The magnet schools, the summer school program and all these programs are tied to that goal, and until such time as that goal has been reached, then we have not reached the goal. . . . The goal is to integrate the Kansas City, Missouri, School district. So I think we are wasting our time." 2 App. 482 (emphasis added).

See 11 F. 3d, at 761. Apparently, the Court of Appeals extrapolated from the findings regarding the magnet-school

program and later orders and imported those findings whole-
sale to reject the State's request for a determination of par-
tial unitary status as to the quality education programs.
See *id.*, at 761–762. It found significant the District Court's
determination that although "there had been a trend of im-
provement in academic achievement, . . . the school district
was far from reaching its maximum potential because
KCMSD is still at or below national norms at many grade
levels." *Ibid.* It went on to say that with respect to qual-
ity education, "implementation of programs in and of itself is
not sufficient. The test, after all, is whether the vestiges of
segregation, here the systemwide reduction in student
achievement, have been eliminated to the greatest extent
practicable. The success of quality of education programs
must be measured by their effect on the students, particu-
larly those who have been the victims of segregation." *Id.*,
at 766.

The Court of Appeals denied rehearing en banc, with five
judges dissenting. 19 F. 3d, at 395. The dissent first exam-
ined the salary increases ordered by the District Court and
characterized "the current effort by the KCMSD and the
American Federation of Teachers . . . aided by the plaintiffs,
to bypass the collective bargaining process" as "uncalled for"
and "probably not an exercise reasonably related to the con-
stitutional violations found by the court." *Id.*, at 399. The
dissent also "agree[d] with the [S]tate that logic d[id] not
directly relate the pay of parking lot attendants, trash haul-
ers and food handlers . . . to any facet or phase of the deseg-
regation plan or to the constitutional violations." *Ibid.*

Second, the dissent believed that in evaluating whether
the KCMSD had achieved partial unitary status in its quality
education programs, the District Court and the panel had

"misrea[d] *Freeman* and create[d] a hurdle to the with-
drawal of judicial intervention from public education
that has no support in the law. The district court has,

with the approbation of the panel, imbedded a student achievement goal measured by annual standardized tests into its test of whether the KCMSD has built a high-quality educational system sufficient to remedy past discrimination. The Constitution requires no such standard." *Id.*, at 400.

The dissent noted that "KCMSD students have in place a system that offers more educational opportunity than anywhere in America," *id.*, at 403, but that the District Court was "'not satisfied that the District has reached anywhere close to its *maximum potential* because the District is still at or below national norms at many grade levels,'" *ibid.* (emphasis added). The dissent concluded that this case, "as it now proceeds, involves an exercise in pedagogical sociology, not constitutional adjudication." *Id.*, at 404.

Because of the importance of the issues, we granted certiorari to consider the following: (1) whether the District Court exceeded its constitutional authority when it granted salary increases to virtually all instructional and noninstructional employees of the KCMSD, and (2) whether the District Court properly relied upon the fact that student achievement test scores had failed to rise to some unspecified level when it declined to find that the State had achieved partial unitary status as to the quality education programs. 512 U. S. 1287 (1994).

### III

Respondents argue that the State may no longer challenge the District Court's remedy, and in any event, the propriety of the remedy is not before the Court. Brief for Respondents KCMSD et al. 40–49; Brief for Respondents Jenkins et al. 23. We disagree on both counts. In *Jenkins II*, we granted certiorari to review the manner in which the District Court had funded this desegregation remedy. 495 U. S., at 37. Because we had denied certiorari on the State's

challenge to review the scope of the remedial order, we resisted the State's efforts to challenge the scope of the remedy. *Id.*, at 53; cf. *id.*, at 80 (KENNEDY, J., concurring in part and concurring in judgment). Thus, we neither "approv[ed]" nor "disapprov[ed] the Court of Appeals' conclusion that the District Court's remedy was proper." *Id.*, at 53.

Here, however, the State has challenged the District Court's approval of across-the-board salary increases for instructional and noninstructional employees as an action beyond its remedial authority. Pet. for Cert. i.[3] An analysis of the permissible scope of the District Court's remedial authority is necessary for a proper determination of whether the order of salary increases is beyond the District Court's remedial authority, see *Milliken I*, 418 U. S., at 738–740, 745, and thus, it is an issue subsidiary to our ultimate inquiry. Cf. *Yee* v. *Escondido*, 503 U. S. 519, 537 (1992). Given that the District Court's basis for its salary order was grounded in "improving the desegregative attractiveness of the KCMSD," App. to Pet. for Cert. A–90, we must consider the propriety of that reliance in order to resolve properly the State's challenge to that order. We conclude that a challenge to the scope of the District Court's remedy is fairly included in the question presented. See this Court's Rule 14.1; *Procunier* v. *Navarette*, 434 U. S. 555, 560, n. 6 (1978) ("Since consideration of these issues is essential to analysis of the Court of Appeals' [decision] we shall also treat these questions as subsidiary issues 'fairly comprised' by the question presented"); see also *United States* v. *Mendenhall*, 446 U. S. 544, 551–552, n. 5 (1980) (opinion of Stewart, J.) (Where

---

[3] "Whether a federal court order granting salary increases to virtually every employee of a school district—including non-instructional personnel—as part of a school desegregation remedy conflicts with applicable decisions of this court which require that remedial components must directly address and relate to the constitutional violation and be tailored to cure the condition that offends the Constitution?" Pet. for Cert. i.

the determination of a question "is essential to the correct disposition of the other issues in the case, we shall treat it as 'fairly comprised' by the questions presented in the petition for certiorari"); cf. *Yee, supra,* at 536–537.

JUSTICE SOUTER argues that our decision to review the scope of the District Court's remedial authority is both unfair and imprudent. *Post,* at 147. He claims that factors such as our failure to grant certiorari on the State's challenge to the District Court's remedial authority in 1988 "lulled [respondents] into addressing the case without sufficient attention to the foundational issue, and their lack of attention has now infected the Court's decision." *Post,* at 139. JUSTICE SOUTER concludes that we have "decide[d] the issue without any warning to respondents." *Post,* at 147. These arguments are incorrect.

Of course, "[t]he denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times." *United States* v. *Carver,* 260 U. S. 482, 490 (1923). *A fortiori,* far from lulling respondents into a false sense of security, our previous decision in *Jenkins* v. *Missouri* put respondents on notice that the Court had not affirmed the validity of the District Court's remedy, 495 U. S., at 53, and that at least four Justices of the Court questioned that remedy, *id.,* at 75–80 (KENNEDY, J., concurring in part and concurring in judgment).

With respect to the specific orders at issue here, the State has once again challenged the scope of the District Court's remedial authority. The District Court was aware of this fact. See App. to Pet. for Cert. A–86 ("The State claims that the Court should not approve desegregation funding for salaries because such funding would be beyond the scope of the Court's remedial authority") (District Court's June 25, 1992, order); *id.,* at A–97 ("The State has argued repeatedly and currently on appeal that the salary component is not a valid component of the desegregation remedy") (District

Court's June 30, 1993, order). The Court of Appeals also understood that the State had renewed this challenge. See 11 F. 3d, at 766 ("The State argues first that the salary increase remedy sought exceeded that necessary to remedy the constitutional violations, and alternatively, that if the district court had lawful authority to impose the increases, it abused its discretion in doing so"); *id.*, at 767 ("The State's legal argument is that the district court should have denied the salary increase funding because it is contrary to *Milliken* [v. *Bradley*, 433 U. S. 267 (1977),] and *Swann* [v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1 (1971),] in that it does not directly address and relate to the State's constitutional violation"); 13 F. 3d, at 1172 ("We reject the State's argument that the salary order is contrary to *Milliken II* and *Swann*"). The State renewed this same challenge in its petition for certiorari, Pet. for Cert. i, and argued here that the District Court's salary orders were beyond the scope of its remedial authority. Brief for Petitioners 27–32; Reply Brief for Petitioners 6–12. In the 100 pages of briefing provided by respondents, they have argued that the State's challenge to the scope of the District Court's remedial authority is not fairly presented *and* is meritless. See Brief for Respondents KCMSD et al. 40–49; Brief for Respondents Jenkins et al. 2–21, 44–49; cf. Reply Brief for Petitioners 2 ("[R]espondents . . . urge the Court to dismiss the writ as improvidently granted. This is not surprising; respondents cannot defend the excesses of the courts below").

In short, the State has challenged the scope of the District Court's remedial authority. The District Court, the Court of Appeals, and respondents have recognized this to be the case. Contrary to JUSTICE SOUTER's arguments, there is no unfairness or imprudence in deciding issues that have been passed upon below, are properly before us, and have been briefed by the parties. We turn to the questions presented.

Almost 25 years ago, in *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1 (1971), we dealt with the authority of a district court to fashion remedies for a school district that

had been segregated in law in violation of the Equal Protection Clause of the Fourteenth Amendment. Although recognizing the discretion that must necessarily adhere in a district court in fashioning a remedy, we also recognized the limits on such remedial power:

> "[E]limination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of the school authorities. One vehicle can carry only a limited amount of baggage. It would not serve the important objective of *Brown* [v. *Board of Education,* 347 U. S. 483 (1954),] to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination." *Id.,* at 22–23.

Three years later, in *Milliken I,* 418 U. S. 717 (1974), we held that a District Court had exceeded its authority in fashioning interdistrict relief where the surrounding school districts had not themselves been guilty of any constitutional violation. *Id.,* at 746–747. We said that a desegregation remedy "is necessarily designed, as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Id.,* at 746. "[W]ithout an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy." *Id.,* at 745. We also rejected "[t]he suggestion . . . that schools which have a majority of Negro students are not 'desegregated,' whatever the makeup of the school district's population and however neutrally the district lines have been drawn and administered." *Id.,* at 747, n. 22; see also *Freeman,* 503 U. S., at 474 ("[A] critical beginning point is the degree of racial imbalance in the school district, that is to say a comparison of the proportion of majority to minority students in individual schools with the proportions of the races in the district as a whole").

Three years later, in *Milliken* v. *Bradley*, 433 U. S. 267 (1977) *(Milliken II)*, we articulated a three-part framework derived from our prior cases to guide district courts in the exercise of their remedial authority.

> "In the first place, like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S., at 16. The remedy must therefore be related to 'the *condition* alleged to offend the Constitution. . . .' *Milliken I*, 418 U. S., at 738. Second, the decree must indeed be *remedial* in nature, that is, it must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.' *Id.*, at 746. Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Id.*, at 280–281 (footnotes omitted).

We added that the "principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself." *Id.*, at 281–282. In applying these principles, we have identified "student assignments, . . . 'faculty, staff, transportation, extracurricular activities and facilities'" as the most important indicia of a racially segregated school system. *Board of Ed. of Oklahoma City Public Schools* v. *Dowell*, 498 U. S. 237, 250 (1991) (quoting *Green* v. *School Bd. of New Kent Cty.*, 391 U. S. 430, 435 (1968)).

Because "federal supervision of local school systems was intended as a temporary measure to remedy past discrimination," *Dowell, supra*, at 247, we also have considered the showing that must be made by a school district operating under a desegregation order for complete or partial relief from that order. In *Freeman*, we stated that

"[a]mong the factors which must inform the sound discretion of the court in ordering partial withdrawal are the following: [1] whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; [2] whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and [3] whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the courts' decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." 503 U. S., at 491.

The ultimate inquiry is "'whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.'" *Id.*, at 492 (quoting *Dowell, supra*, at 249–250).

Proper analysis of the District Court's orders challenged here, then, must rest upon their serving as proper means to the end of restoring the victims of discriminatory conduct to the position they would have occupied in the absence of that conduct and their eventual restoration of "state and local authorities to the control of a school system that is operating in compliance with the Constitution." 503 U. S., at 489. We turn to that analysis.

The State argues that the order approving salary increases is beyond the District Court's authority because it was crafted to serve an "interdistrict goal," in spite of the fact that the constitutional violation in this case is "intradistrict" in nature. Brief for Petitioners 19. "[T]he nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation." *Milliken II, supra*, at 280; *Pasadena City Bd. of Ed.* v. *Spangler*, 427 U. S. 424, 434 (1976) ("'[T]here are limits' beyond which a

court may not go in seeking to dismantle a dual school system"). The proper response to an intradistrict violation is an intradistrict remedy, see *Milliken I, supra,* at 746–747; *Milliken II, supra,* at 280, that serves to eliminate the racial identity of the schools within the affected school district by eliminating, as far as practicable, the vestiges of *de jure* segregation in all facets of their operations. See *Dowell, supra,* at 250; see also *Swann,* 402 U. S., at 18–19; *Green, supra,* at 435.

Here, the District Court has found, and the Court of Appeals has affirmed, that this case involved no interdistrict constitutional violation that would support interdistrict relief. *Jenkins II,* 495 U. S., at 37, n. 3 ("The District Court also found that none of the alleged discriminatory actions had resulted in lingering interdistrict effects and so dismissed the suburban school districts and denied interdistrict relief"); *id.,* at 76 (KENNEDY, J., concurring in part and concurring in judgment) ("[T]here was no interdistrict constitutional violation that would support mandatory interdistrict relief").[4] Thus, the proper response by the District Court should have been to eliminate to the extent practicable the vestiges of prior *de jure* segregation within the KCMSD: a systemwide reduction in student achievement and the existence of 25 racially identifiable schools with a population of over 90% black students. 639 F. Supp., at 24, 36.

---

[4] See also *Jenkins* v. *Missouri,* 931 F. 2d 1273, 1274 (CA8 1991) ("[T]he district court in September 1984 held the State defendants and the KCMSD liable for intradistrict segregation"); *Jenkins* v. *Missouri,* 931 F. 2d 470, 475 (CA8 1991) ("In a June 5, 1984, order the district court rejected claims of interdistrict violations"); *Jenkins* v. *Missouri,* 838 F. 2d 260, 264 (CA8 1988) ("In this case, the plaintiffs made unsuccessful claims against the State as well as the suburban, federal, and Kansas defendants for interdistrict relief. They also made successful intradistrict claims against the State and KCMSD"); *Jenkins* v. *Missouri,* 807 F. 2d 657, 669–670 (CA8 1986) (en banc) ("[T]he argument that KCMSD officially sanctioned suburban flight looks first to KCMSD's violation which the district court clearly found to be only intradistrict in nature").

The District Court and Court of Appeals, however, have felt that because the KCMSD's enrollment remained 68.3% black, a purely *intra*district remedy would be insufficient. *Id.*, at 38; *Jenkins* v. *Missouri*, 855 F. 2d 1296, 1302 (CA8 1988) ("*[V]oluntary* interdistrict remedies may be used to make meaningful integration possible in a predominantly minority district"). But, as noted in *Milliken I*, 418 U. S. 717 (1974), we have rejected the suggestion "that schools which have a majority of Negro students are not 'desegregated' whatever the racial makeup of the school district's population and however neutrally the district lines have been drawn and administered." *Id.*, at 747, n. 22; see *Milliken II*, 433 U. S., at 280, n. 14 ("[T]he Court has consistently held that the Constitution is not violated by racial imbalance in the schools, without more"); *Spangler, supra*, at 434.[5]

Instead of seeking to remove the racial identity of the various schools within the KCMSD, the District Court has set out on a program to create a school district that was equal to or superior to the surrounding SSD's. Its remedy has focused on "desegregative attractiveness," coupled with "suburban comparability." Examination of the District Court's reliance on "desegregative attractiveness" and "suburban comparability" is instructive for our ultimate resolution of the salary-order issue.

The purpose of desegregative attractiveness has been not only to remedy the systemwide reduction in student achievement, but also to attract nonminority students not presently enrolled in the KCMSD. This remedy has included an elaborate program of capital improvements, course enrichment,

---

[5] See also *Green* v. *School Bd. of New Kent Cty.*, 391 U. S. 430, 432 (1968) (approving a desegregation plan which had a racial composition of 57% black and 43% white); *Wright* v. *Council of Emporia*, 407 U. S. 451, 457 (1972) (approving a desegregation plan which had a racial composition of 66% black and 34% white); *United States* v. *Scotland Neck City Bd. of Ed.*, 407 U. S. 484, 491, n. 5 (1972) (approving implicitly a desegregation plan which had a racial composition of 77% black and 22% white).

and extracurricular enhancement not simply in the formerly identifiable black schools, but in schools throughout the district. The District Court's remedial orders have converted every senior high school, every middle school, and one-half of the elementary schools in the KCMSD into "magnet" schools. The District Court's remedial order has all but made the KCMSD itself into a magnet district.

We previously have approved of intradistrict desegregation remedies involving magnet schools. See, *e. g., Milliken II, supra,* at 272. Magnet schools have the advantage of encouraging voluntary movement of students within a school district in a pattern that aids desegregation on a voluntary basis, without requiring extensive busing and redrawing of district boundary lines. Cf. *Jenkins II, supra,* at 59–60 (KENNEDY, J., concurring in part and concurring in judgment) (citing *Milliken II, supra,* at 272). As a component in an intradistrict remedy, magnet schools also are attractive because they promote desegregation while limiting the withdrawal of white student enrollment that may result from mandatory student reassignment. See 639 F. Supp., at 37; cf. *United States* v. *Scotland Neck City Bd. of Ed.,* 407 U. S. 484, 491 (1972).

The District Court's remedial plan in this case, however, is not designed solely to redistribute the students within the KCMSD in order to eliminate racially identifiable schools within the KCMSD. Instead, its purpose is to attract non-minority students from outside the KCMSD schools. But this *inter*district goal is beyond the scope of the *intra*district violation identified by the District Court. In effect, the District Court has devised a remedy to accomplish indirectly what it admittedly lacks the remedial authority to mandate directly: the interdistrict transfer of students. 639 F. Supp., at 38 ("'[B]ecause of restrictions on this Court's remedial powers in restructuring the operations of local and state government entities,' any *mandatory* plan which would go beyond the boundary lines of KCMSD goes far beyond

the nature and extent of the constitutional violation [that] this Court found existed").

In *Milliken I* we determined that a desegregation remedy that would require mandatory interdistrict reassignment of students throughout the Detroit metropolitan area was an impermissible interdistrict response to the intradistrict violation identified. 418 U. S., at 745. In that case, the lower courts had ordered an interdistrict remedy because " 'any less comprehensive a solution than a metropolitan area plan would result in an all black school system immediately surrounded by practically all white suburban school systems, with an overwhelmingly white majority population in the total metropolitan area.' " *Id.*, at 735. We held that before a district court could order an interdistrict remedy, there must be a showing that "racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation." *Id.*, at 745. Because the record "contain[ed] evidence of *de jure* segregated conditions only in the Detroit Schools" and there had been "no showing of significant violation by the 53 outlying school districts and no evidence of interdistrict violation or effect," we reversed the District Court's grant of interdistrict relief. *Ibid.*

Justice Stewart provided the Court's fifth vote and wrote separately to underscore his understanding of the decision. In describing the requirements for imposing an "interdistrict" remedy, Justice Stewart stated: "Were it to be shown, for example, that state officials had contributed to the separation of the races by drawing or redrawing school district lines; by transfer of school units between districts; or by purposeful, racially discriminatory use of state housing or zoning laws, then a decree calling for the transfer of pupils across district lines or for restructuring of district lines might well be appropriate. In this case, however, no such interdistrict violation was shown." *Id.*, at 755 (concurring opinion) (citations omitted). Justice Stewart concluded that the Court

properly rejected the District Court's interdistrict remedy because "[t]here were no findings that the differing racial composition between schools in the city and in the outlying suburbs was caused by official activity of any sort." *Id.*, at 757.

What we meant in *Milliken I* by an interdistrict violation was a violation that caused segregation between adjoining districts. Nothing in *Milliken I* suggests that the District Court in that case could have circumvented the limits on its remedial authority by requiring the State of Michigan, a constitutional violator, to implement a magnet program designed to achieve the same interdistrict transfer of students that we held was beyond its remedial authority. Here, the District Court has done just that: created a magnet district of the KCMSD in order to serve the *inter*district goal of attracting nonminority students from the surrounding SSD's and redistributing them within the KCMSD. The District Court's pursuit of "desegregative attractiveness" is beyond the scope of its broad remedial authority. See *Milliken II*, 433 U. S., at 280.

Respondents argue that the District Court's reliance upon desegregative attractiveness is justified in light of the District Court's statement that segregation has "led to white flight from the KCMSD to suburban districts." 1 App. 126; see Brief for Respondents KCMSD et al. 44–45, and n. 28; Brief for Respondents Jenkins et al. 47–49.[6] The lower

---

[6] Prior to 1954, Missouri mandated segregated schools for black and white children. *Jenkins* v. *Missouri*, 593 F. Supp. 1485, 1490 (WD Mo. 1984). Immediately after the Court's decision in *Brown* v. *Board of Education*, 347 U. S. 483 (1954), the State's Attorney General issued an opinion declaring the provisions that mandated segregation unenforceable. 593 F. Supp., at 1490. In the 1954–1955 school year, 18.9% of the KCMSD's students were black. 807 F. 2d, at 680. The KCMSD became 30% black in the 1961–1962 school year, 40% black in the 1965–1966 school year, and 60% black in the 1975–1976 school year. *Ibid.* In 1977, the KCMSD implemented the 6C desegregation plan in order to ensure that each school within the KCMSD had a minimum minority enrollment of 30%. *Jenkins*

courts' "findings" as to "white flight" are both inconsistent internally,[7] and inconsistent with the typical supposition, bolstered here by the record evidence, that "white flight" may result from desegregation, not *de jure* segregation.[8] The United States, as *amicus curiae*, argues that the District Court's finding that "*de jure* segregation in the KCMSD caused white students to leave the system . . . is not inconsistent with the district court's earlier conclusion that the suburban districts did nothing to cause this white flight and therefore could not be included in a mandatory interdistrict remedy." Brief for United States as *Amicus Curiae* 19, n. 2; see also *post*, at 160–164. But the District Court's earlier findings, affirmed by the Court of Appeals, were not so limited:

> "[C]ontrary to the argument of [plaintiffs] that the [district court] looked only to the culpability of the SSDs, the scope of the order is far broader. . . . It noted that only the schools in one district were affected and that the remedy must be limited to that system. In examining the cause and effect issue, the court noted that 'not only is plaintiff's evidence here blurred as to cause and

v. *Missouri*, 639 F. Supp. 19, 35 (WD Mo. 1985). Overall enrollment in KCMSD decreased by 30% from the time that the 6C plan first was implemented until 1986. *Id.*, at 36. During the same time period, white enrollment decreased by 44%. *Ibid.*

[7] Compare n. 4, *supra*, and *Jenkins*, 807 F. 2d, at 662 ("[N]one of the alleged discriminatory actions committed by the State or the federal defendants ha[s] caused any significant current interdistrict segregation"), with *Jenkins* v. *Missouri*, 855 F. 2d 1295, 1302 (CA8 1988) ("These holdings are bolstered by the district court's findings that the preponderance of black students in the district was due to the State and KCMSD's constitutional violations, which caused white flight").

[8] "During the hearing on the liability issue in this case there was an abundance of evidence that many residents of the KCMSD left the district and moved to the suburbs because of the district's efforts to integrate its schools." 1 App. 239; see also *Scotland Neck City Bd. of Ed.*, 407 U. S., at 491 (recognizing that implementation of a desegregation remedy may result in "white flight").

effect, there is no "careful delineation of the extent of the effect." ' . . . The district court thus dealt not only with the issue whether the SSDs were constitutional violators but also whether there were significant interdistrict segregative effects. . . . When it did so, it made specific findings that negate current significant interdistrict effects, and concluded that the requirements of Milliken had not been met." *Jenkins* v. *Missouri,* 807 F. 2d 657, 672 (CA8 1986) (affirming, by an equally divided court, the District Court's findings and conclusion that there was no interdistrict violation or interdistrict effect) (en banc).[9]

In *Freeman,* we stated that "[t]he vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied." 503 U. S., at 496. The record here does not support the District Court's reliance on "white flight" as a justification for a permissible expansion of its intradistrict remedial authority through its pursuit of desegregative attractiveness. See *Milliken I,* 418 U. S., at 746; see also *Dayton Bd. of Ed.* v. *Brinkman,* 433 U. S. 406, 417 (1977) *(Dayton I).*

JUSTICE SOUTER claims that our holding effectively overrules *Hills* v. *Gautreaux,* 425 U. S. 284 (1976). See also Brief for American Civil Liberties Union et al. as *Amici Curiae* 18–20. In *Gautreaux,* the Federal Department of

---

[9] JUSTICE SOUTER construes the Court of Appeals' determination to mean that the violations by the State and the KCMSD did not cause segregation within the limits of each of the SSD's. *Post,* at 163–164. But the Court of Appeals would not have decided this question at the behest of these plaintiffs—present and future KCMSD students—who have no standing to challenge segregation within the confines of the SSD's. Cf. *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560–561 (1992). Ergo, the Court of Appeals meant exactly what it said: the requirements of *Milliken I* had not been met because the District Court's specific findings "negate current significant interdistrict effects." *Jenkins,* 807 F. 2d, at 672.

Housing and Urban Development (HUD) was found to have participated, along with a local housing agency, in establishing and maintaining a racially segregated public housing program. 425 U. S., at 286–291. After the Court of Appeals ordered " 'the adoption of a comprehensive metropolitan area plan,' " *id.*, at 291, we granted certiorari to consider the "permissibility in light of *[Milliken I]* of 'inter-district relief for discrimination in public housing in the absence of a finding of an inter-district violation.' " *Gautreaux, supra,* at 292. Because the "relevant geographic area for purposes of the [plaintiffs'] housing options [was] the Chicago housing market, not the Chicago city limits," 425 U. S., at 299, we concluded that "a metropolitan area remedy . . . [was] not impermissible as a matter of law," *id.*, at 306. Cf. *id.*, at 298, n. 13 (distinguishing *Milliken I*, in part, because prior cases had established that racial segregation in schools is "to be dealt with in terms of 'an established geographic and administrative school system' ").

In *Gautreaux,* we did not obligate the District Court to "subjec[t] HUD to measures going beyond the geographical or political boundaries of its violation." *Post,* at 171–172. Instead, we cautioned that our holding "should not be interpreted as requiring a metropolitan area order." *Gautreaux,* 425 U. S., at 306. We reversed appellate factfinding by the Court of Appeals that would have mandated a metropolitan-area remedy, see *id.*, at 294–295, n. 11, and remanded the case back to the District Court " 'for additional evidence and for further consideration of the issue of metropolitan area relief,' " *id.*, at 306.

Our decision today is fully consistent with *Gautreaux.* A district court seeking to remedy an *intra*district violation that has not "directly caused" significant interdistrict effects, *Milliken I, supra,* at 744–745, exceeds its remedial authority if it orders a remedy with an interdistrict purpose. This conclusion follows directly from *Milliken II,* decided one year after *Gautreaux,* where we reaffirmed the bedrock

principle that "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation." 433 U. S., at 282. In *Milliken II*, we also emphasized that "federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Id.*, at 280–281. *Gautreaux*, however, involved the imposition of a remedy upon a federal agency. See 425 U. S., at 292, n. 9. Thus, it did not raise the same federalism concerns that are implicated when a federal court issues a remedial order against a State. See *Milliken II, supra*, at 280–281.

The District Court's pursuit of "desegregative attractiveness" cannot be reconciled with our cases placing limitations on a district court's remedial authority. It is certainly theoretically possible that the greater the expenditure per pupil within the KCMSD, the more likely it is that some unknowable number of nonminority students not presently attending schools in the KCMSD will choose to enroll in those schools. Under this reasoning, however, every increased expenditure, whether it be for teachers, noninstructional employees, books, or buildings, will make the KCMSD in some way more attractive, and thereby perhaps induce nonminority students to enroll in its schools. But this rationale is not susceptible to any objective limitation. Cf. *Milliken II, supra*, at 280 (remedial decree "must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct'"). This case provides numerous examples demonstrating the limitless authority of the District Court operating under this rationale. See, *e. g.*, App. to Pet. for Cert. A–115 (The District Court has recognized that it has "provide[d] the KCMSD with facilities and opportunities not available anywhere else in the country"); *id.*, at A–140 ("The District has repeatedly requested that the [District Court] provide ex-

travagant programs based on the hopes that they will succeed in the desegregation effort"). In short, desegregative attractiveness has been used "as the hook on which to hang numerous policy choices about improving the quality of education in general within the KCMSD." *Jenkins II*, 495 U. S., at 76 (KENNEDY, J., concurring in part and concurring in judgment).

Nor are there limits to the duration of the District Court's involvement. The expenditures per pupil in the KCMSD currently far exceed those in the neighboring SSD's. 19 F. 3d, at 399 (Beam, J., dissenting from denial of rehearing en banc) (per-pupil costs within the SSD's, excluding capital costs, range from $2,854 to $5,956; per-pupil costs within the KCMSD, excluding capital costs, are $9,412); Brief for Respondent KCMSD et al. 18, n. 5 (arguing that per-pupil costs in the KCMSD, excluding capital costs, are $7,665.18). Sixteen years after this litigation began, the District Court recognized that the KCMSD has yet to offer a viable method of financing the "wonderful school system being built." App. to Pet. for Cert. A–124; cf. *Milliken II, supra,* at 293 (Powell, J., concurring in judgment) ("Th[e] parties . . . have now joined forces apparently for the purpose of extracting funds from the state treasury"). Each additional program ordered by the District Court—and financed by the State—to increase the "desegregative attractiveness" of the school district makes the KCMSD more and more dependent on additional funding from the State; in turn, the greater the KCMSD's dependence on state funding, the greater its reliance on continued supervision by the District Court. But our cases recognize that local autonomy of school districts is a vital national tradition, *Dayton I*, 433 U. S., at 410, and that a district court must strive to restore state and local authorities to the control of a school system operating in compliance with the Constitution. See *Freeman*, 503 U. S., at 489; *Dowell*, 498 U. S., at 247.

The District Court's pursuit of the goal of "desegregative attractiveness" results in so many imponderables and is so far removed from the task of eliminating the racial identifiability of the schools within the KCMSD that we believe it is beyond the admittedly broad discretion of the District Court. In this posture, we conclude that the District Court's order of salary increases, which was "grounded in remedying the vestiges of segregation by improving the desegregative attractiveness of the KCMSD," App. to Pet. for Cert. A–90, is simply too far removed from an acceptable implementation of a permissible means to remedy previous legally mandated segregation. See *Milliken II*, 433 U. S., at 280.

Similar considerations lead us to conclude that the District Court's order requiring the State to continue to fund the quality education programs because student achievement levels were still "at or below national norms at many grade levels" cannot be sustained. The State does not seek from this Court a declaration of partial unitary status with respect to the quality education programs. Reply Brief for Petitioners 3. It challenges the requirement of indefinite funding of a quality education program until national norms are met, based on the assumption that while a mandate for significant educational improvement, both in teaching and in facilities, may have been justified originally, its indefinite extension is not.

Our review in this respect is needlessly complicated because the District Court made no findings in its order approving continued funding of the quality education programs. See App. to Pet. for Cert. A–69 to A–75. Although the Court of Appeals later recognized that a determination of partial unitary status requires "careful factfinding and detailed articulation of findings," 11 F. 3d, at 765, it declined to remand to the District Court. Instead it attempted to assemble an adequate record from the District Court's state-

ments from the bench and subsequent orders. *Id.*, at 761. In one such order relied upon by the Court of Appeals, the District Court stated that the KCMSD had not reached anywhere close to its "maximum potential because the District is still at or below national norms at many grade levels." App. to Pet. for Cert. A–131.

But this clearly is not the appropriate test to be applied in deciding whether a previously segregated district has achieved partially unitary status. See *Freeman, supra,* at 491; *Dowell,* 498 U. S., at 249–250. The basic task of the District Court is to decide whether the reduction in achievement by minority students attributable to prior *de jure* segregation has been remedied to the extent practicable. Under our precedents, the State and the KCMSD are "entitled to a rather precise statement of [their] obligations under a desegregation decree." *Id.*, at 246. Although the District Court has determined that "[s]egregation has caused a system wide *reduction* in achievement in the schools of the KCMSD," 639 F. Supp., at 24, it never has identified the incremental effect that segregation has had on minority student achievement or the specific goals of the quality education programs. Cf. *Dayton I, supra,* at 420.[10]

In reconsidering this order, the District Court should apply our three-part test from *Freeman* v. *Pitts, supra,* at 491. The District Court should consider that the State's role with respect to the quality education programs has been limited to the funding, not the implementation, of those programs. As all the parties agree that improved achievement on test scores is not necessarily required for the State to achieve partial unitary status as to the quality education programs, the District Court should sharply limit, if not dispense with, its reliance on this factor. Brief for Respond-

---

[10] To the extent that the District Court has adopted the quality education program to further the goal of desegregative attractiveness, that goal is no longer valid. See *supra,* at 91–100.

ents KCMSD et al. 34–35; Brief for Respondents Jenkins et al. 26. Just as demographic changes independent of *de jure* segregation will affect the racial composition of student as-signments, *Freeman*, 503 U. S., at 494–495, so too will nu-merous external factors beyond the control of the KCMSD and the State affect minority student achievement. So long as these external factors are not the result of segregation, they do not figure in the remedial calculus. See *Spangler*, 427 U. S., at 434; *Swann*, 402 U. S., at 22. Insistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day when the KCMSD will be able to operate on its own.

The District Court also should consider that many goals of its quality education plan already have been attained: the KCMSD now is equipped with "facilities and opportunities not available anywhere else in the country." App. to Pet. for Cert. A–115. KCMSD schools received an AAA rating eight years ago, and the present remedial programs have been in place for seven years. See 19 F. 3d, at 401 (Beam, J., dissenting from denial of rehearing en banc). It may be that in education, just as it may be in economics, a "rising tide lifts all boats," but the remedial quality educa-tion program should be tailored to remedy the injuries suf-fered by the victims of prior *de jure* segregation. See *Milli-ken II, supra,* at 287. Minority students in kindergarten through grade 7 in the KCMSD always have attended AAA-rated schools; minority students in the KCMSD that pre-viously attended schools rated below AAA have since re-ceived remedial education programs for a period of up to seven years.

On remand, the District Court must bear in mind that its end purpose is not only "to remedy the violation" to the extent practicable, but also "to restore state and local au-thorities to the control of a school system that is operat-ing in compliance with the Constitution." *Freeman, supra,* at 489.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

Because "[t]he mere fact that one question must be answered before another does not insulate the former from Rule 14.1(a)," *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 404 (1995) (O'CONNOR, J., dissenting), I reject the State's contention that the propriety of the District Court's remedy is fairly included in the question whether student achievement is a valid measure of partial unitary status as to the quality education program, Brief for Petitioners 18.

The State, however, also challenges the District Court's order setting salaries for all but 3 of the 5,000 persons employed by the Kansas City, Missouri, School District (KCMSD). In that order, the court stated: "[T]he basis for this Court's ruling is grounded in remedying the vestiges of segregation by improving the desegregative attractiveness of the KCMSD. In order to improve the desegregative attractiveness of the KCMSD, the District must hire and retain high quality teachers, administrators and staff." App. to Pet. for Cert. A–90. The question presented in the petition for certiorari asks whether the order comports with our cases requiring that remedies "address and relate to the constitutional violation and be tailored to cure the condition that offends the Constitution," Pet. for Cert. i. Thus, the State asks not only whether salary increases are an appropriate means to achieve the District Court's goal of desegregative attractiveness, but also whether that goal itself legitimately relates to the predicate constitutional violation. The propriety of desegregative attractiveness as a remedial purpose, therefore, is not simply an issue "prior to the clearly presented question," *Lebron, supra,* at 382; it is an issue presented in the question itself and, as such, is one that

we appropriately and necessarily consider in answering that question.

Beyond the plain words of the question presented, the State's opening brief placed respondents on notice of its argument; fully 25 of the State's 30 pages of discussion were devoted to desegregative attractiveness and suburban comparability. See Brief for Petitioners 19–45. Such focus should not come as a surprise. At every stage of this litigation, as the Court notes, *ante,* at 85–86, the State has questioned whether the salary increase order exceeded the nature and scope of the constitutional violation. In disposing of the argument, the lower courts explicitly relied on the need for desegregative attractiveness and suburban comparability. See, *e. g.,* 13 F. 3d, 1170, 1172 (CA8 1993) ("The significant finding of the court with respect to the earlier funding order was that the salary increases were essential to comply with the court's desegregation orders, and that high quality teachers, administrators, and staff must be hired to improve the desegregative attractiveness of KCMSD"); 11 F. 3d 755, 767 (CA8 1993) ("In addition to compensating the victims, the remedy in this case was also designed to reverse white flight by offering superior educational opportunities").

Given the State's persistence and the specificity of the lower court decisions, respondents would have ignored the State's arguments on white flight and desegregative attractiveness at their own peril. But they did not do so, and instead engaged those arguments on the merits. See Brief for Respondents KCMSD et al. 44–49; Brief for Respondents Jenkins et al. 41–49. Perhaps the response was not made as artfully and completely as the dissenting Justices would like, but it was made nevertheless; whatever the cause of respondents' supposed failure to appreciate "what was really at stake," *post,* at 139 (SOUTER, J., dissenting), it is certainly not lack of fair notice.

Given such notice, there is no unfairness to the Court resolving the issue. Unlike *Bray* v. *Alexandria Women's*

*Health Clinic,* 506 U. S. 263 (1993), for example, where in order to decide a particular question, one would have had to "find in the complaint claims that the respondents themselves have admitted are not there; . . . resolve a question not presented to, or ruled on by, any lower court; . . . revise the rule that it is the petition for certiorari (not the brief in opposition and later briefs) that determines the questions presented; and . . . penalize the parties for not addressing an issue on which the Court specifically denied supplemental briefing," *id.,* at 280–281, in this case one need only read the opinions below to see that the question of desegregative attractiveness was presented to and passed upon by the lower courts; the petition for certiorari to see that it was properly presented; and the briefs to see that it was fully argued on the merits. If it could be thought that deciding the question in *Bray* presented no "unfairness" because it "was briefed, albeit sparingly, by the parties prior to the first oral argument," *id.,* at 291 (SOUTER, J., concurring in judgment in part and dissenting in part), there should hardly be cause to cry foul here. The Court today transgresses no bounds of orderly adjudication in resolving a genuine dispute that is properly presented for its decision.

On the merits, the Court's resolution of the dispute comports with *Hills* v. *Gautreaux,* 425 U. S. 284 (1976). There, we held that there is no "*per se* rule that federal courts lack authority to order parties found to have violated the Constitution to undertake remedial efforts beyond the municipal boundaries of the city where the violation occurred," *id.,* at 298. This holding follows from our judgment in *Milliken* v. *Bradley,* 418 U. S. 717 (1974) *(Milliken I),* that an interdistrict remedy is permissible, but only upon a showing that "there has been a constitutional violation within one district that produces a significant segregative effect in another district," *id.;* at 745. The *per se* rule that the petitioner urged upon the Court in *Gautreaux* would have erected an "arbitrary and mechanical" shield at the city limits, 425 U. S., at

300, and contradicted the holding in *Milliken I* that remedies may go beyond the boundaries of the constitutional violator. *Gautreaux*, however, does not eliminate the requirement of *Milliken I* that such territorial transgression is permissible only upon a showing that the intradistrict constitutional violation produced significant interdistrict segregative effects; if anything, our opinion repeatedly affirmed that principle, see *Gautreaux, supra,* at 292–294, 296, n. 12.   More important for our purposes here, *Gautreaux* in no way contravenes the underlying principle that the scope of desegregation remedies, even those that are solely intradistrict, is "determined by the nature and extent of the constitutional violation."   *Milliken I, supra,* at 744 (citing *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.,* 402 U. S. 1, 16 (1971)).   *Gautreaux* simply does not give federal courts a blank check to impose unlimited remedies upon a constitutional violator.

As an initial matter, *Gautreaux* itself may not even have concerned a case of interdistrict relief, at least not in the sense that *Milliken I* and other school desegregation cases have understood it.   Our opinion made clear that the authority of the Department of Housing and Urban Development (HUD) extends beyond the Chicago city limits, see *Gautreaux,* 425 U. S., at 298–299, n. 14, and that HUD's own administrative practice treated the Chicago metropolitan area as an undifferentiated whole, *id.,* at 299.   Thus, "[t]he relevant geographic area for purposes of the respondents' housing options is the Chicago housing market, not the Chicago city limits."   *Ibid.*   Because the relevant district is the greater metropolitan area, drawing the remedial line at the city limits would be "arbitrary and mechanical."   *Id.,* at 300.

JUSTICE SOUTER, *post,* at 169–170, makes much of how HUD phrased the question presented: whether it is appropriate to grant "'inter-district relief for discrimination in public housing in the absence of a finding of an inter-district violation.'"   *Gautreaux, supra,* at 292.   HUD obviously had an interest in phrasing the question thus, since doing so

emphasizes the alleged deviation from *Milliken I.* But the Court was free to reject HUD's characterization of the relevant district, which it did:

> "The housing market area 'usually extends beyond the city limits' and in the larger markets 'may extend into several adjoining counties.' . . . An order against HUD and CHA regulating their conduct in the greater metropolitan area will do no more than take into account HUD's expert determination of the area relevant to the respondents' housing opportunities and will thus be wholly commensurate with 'the nature and extent of the constitutional violation.'" 425 U. S., at 299–300 (quoting *Milliken I, supra,* at 744).

In light of this explicit holding, any suggestion that *Gautreaux* dispensed with the predicates of *Milliken I* for interdistrict relief rings hollow.

This distinction notwithstanding, the dissent emphasizes a footnote in *Gautreaux,* in which we reversed the finding by the Court of Appeals that "either an interdistrict violation or an interdistrict segregative effect may have been present," 425 U. S., at 294, n. 11, and argues that implicit in that holding is a suggestion that district lines may be ignored even absent a showing of interdistrict segregative effects, *post,* at 173. But no footnote is an island, entire of itself, and our statement in footnote 11 must be read in context. As explained above, we rejected the petitioner's categorical suggestion that "court-ordered metropolitan area relief in this case would be impermissible as a matter of law," 425 U. S., at 305. But the Court of Appeals had gone too far the other way, suggesting that the District Court had to consider metropolitan area relief because the conditions of *Milliken I*—*i. e.,* interdistrict violation or significant interdistrict segregative effects—had been established as a factual matter. We reversed these ill-advised findings by the appellate court in order to preserve to the District Court its proper role,

acknowledged by the dissent, *post*, at 173–174, n. 8, of finding the necessary facts and exercising its discretion accordingly. Indeed, in footnote 11 itself, we repeated the requirement of a "significant segregative effect in another district," *Milliken I*, 418 U. S., at 745, and held that the Court of Appeals' "unsupported speculation falls far short of the demonstration" required, *Gautreaux, supra,* at 295, n. 11. There would have been little need to overrule the Court of Appeals expressly on these factual matters if they were indeed irrelevant.

It is this reading of *Hills* v. *Gautreaux*—as an affirmation of, not a deviation from, *Milliken I*—that the Court of Appeals itself adopted in an earlier phase of this litigation: "*Milliken* and *Hills* make clear that we may grant interdistrict relief only to remedy a constitutional violation by the SSD [suburban school district], or to remedy an interdistrict effect in the SSD caused by a constitutional violation in KCMSD." *Jenkins* v. *Missouri*, 807 F. 2d 657, 672 (CA8 1986) (en banc). Perhaps *Gautreaux* was "mentioned only briefly" by the respondents, *post*, at 174, because the case may actually lend support to the State's argument.

Absent *Gautreaux*, the dissent hangs on the semantic distinction that "the District Court did not mean by an 'intradistrict violation' what the Court apparently means by it today. The District Court meant that the violation within the KCMSD had not led to segregation outside of it, and that no other school districts had played a part in the violation. It did not mean that the violation had not produced effects of any sort beyond the district." *Post*, at 159. The relevant inquiry under *Milliken I* and *Gautreaux*, however, is not whether the intradistrict violation "produced effects of any sort beyond the district," but rather whether such violation caused "significant segregative effects" across district boundaries, *Milliken I, supra,* at 745. When the Court of Appeals affirmed the District Court's initial remedial order, it specifically stated that the District Court "dealt not only with the issue of whether the SSDs [suburban school

districts] were constitutional violators but also whether there were significant interdistrict segregative effects. . . . When it did so, it made specific findings that negate current significant interdistrict effects, and concluded that the requirements of *Milliken* had not been met." *Jenkins* v. *Missouri,* 807 F. 2d, at 672. This holding is unambiguous. Neither the legal responsibility for nor the causal effects of KCMSD's racial segregation transgressed its boundaries, and absent such interdistrict violation or segregative effects, *Milliken* and *Gautreaux* do not permit a regional remedial plan.

JUSTICE SOUTER, however, would introduce a different level of ambiguity, arguing that the District Court took a limited view of what effects are segregative: "[W]hile white flight would have produced significant effects in other school districts, in the form of greatly increased numbers of white students, those effects would not have been segregative beyond the KCMSD, as the departing students were absorbed into wholly unitary systems." *Post,* at 164. Even if accurate, this characterization of the District Court's findings would be of little significance as to its authority to order interdistrict relief. Such remedy is appropriate only "to eliminate the interdistrict segregation directly caused by the constitutional violation," *Milliken I, supra,* at 745. Whatever effects KCMSD's constitutional violation may be ventured to have had on the surrounding districts, those effects would justify interdistrict relief only if they were "segregative beyond the KCMSD."

School desegregation remedies are intended, "as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken I,* 418 U. S., at 746. In the paradigmatic case of an interdistrict violation, where district boundaries are drawn on the basis of race, a regional remedy is appropriate to ensure integration across district lines. So, too, where surrounding districts contribute to the constitu-

tional violation by affirmative acts intended to segregate the races—*e. g.,* where those districts "arrang[e] for white students residing in the Detroit District to attend schools in Oakland and Macomb Counties," *id.,* at 746–747. *Milliken I* of course permits interdistrict remedies in these instances of interdistrict violations. Beyond that, interdistrict remedies are also proper where "there has been a constitutional violation within one district that produces a significant segregative effect in another district." *Id.,* at 745. Such segregative effect may be present where a predominantly black district accepts black children from adjacent districts, see *id.,* at 750, or perhaps even where the fact of intradistrict segregation actually causes whites to flee the district, cf. *Gautreaux,* 425 U. S., at 295, n. 11, for example, to avoid discriminatorily underfunded schools—and such actions produce regional segregation along district lines. In those cases, where a purely intradistrict violation has caused a significant interdistrict segregative effect, certain interdistrict remedies may be appropriate. Where, however, the segregative effects of a district's constitutional violation are contained within that district's boundaries, there is no justification for a remedy that is interdistrict in nature and scope.

Here, where the District Court found that KCMSD students attended schools separated by their race and that facilities have "literally rotted," *Jenkins* v. *Missouri,* 672 F. Supp. 400, 411 (WD Mo. 1987), it of course should order restorations and remedies that would place previously segregated black KCMSD students at par with their white KCMSD counterparts. The District Court went further, however, and ordered certain improvements to KCMSD as a whole, including schools that were not previously segregated; these district-wide remedies may also be justified (the State does not argue the point here) in light of the finding that segregation caused "a system wide *reduction* in student achievement in the schools of the KCMSD," *Jenkins* v. *Missouri,* 639 F. Supp. 19, 24 (WD Mo. 1985). Such remedies

obviously may benefit some who did not suffer under—and, indeed, may have even profited from—past segregation. There is no categorical constitutional prohibition on nonvictims enjoying the collateral, incidental benefits of a remedial plan designed "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken I*, 418 U. S., at 746. Thus, if restoring KCMSD to unitary status would attract whites into the school district, such a reversal of the white exodus would be of no legal consequence.

What the District Court did in this case, however, and how it transgressed the constitutional bounds of its remedial powers, was to make desegregative attractiveness the underlying goal of its remedy for the specific purpose of reversing the trend of white flight. However troubling that trend may be, remedying it is within the District Court's authority only if it is "directly caused by the constitutional violation." *Id.*, at 745. The Court and the dissent attempt to reconcile the different statements by the lower courts as to whether white flight was caused by segregation or desegregation. See *ante*, at 94–96; *post*, at 161–164. One fact, however, is uncontroverted. When the District Court found that KCMSD was racially segregated, the constitutional violation from which all remedies flow in this case, it also found that there was neither an interdistrict violation nor significant interdistrict segregative effects. See *Jenkins* v. *Missouri*, 807 F. 2d, at 672; *ante*, at 96. Whether the white exodus that has resulted in a school district that is 68% black was caused by the District Court's remedial orders or by natural, if unfortunate, demographic forces, we have it directly from the District Court that the segregative effects of KCMSD's constitutional violation did not transcend its geographical boundaries. In light of that finding, the District Court cannot order remedies seeking to rectify regional demographic trends that go beyond the nature and scope of the constitutional violation.

This case, like other school desegregation litigation, is concerned with "the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds." *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S., at 22. Those myriad factors are not readily corrected by judicial intervention, but are best addressed by the representative branches; time and again, we have recognized the ample authority legislatures possess to combat racial injustice, see, *e. g., Wisconsin* v. *Mitchell*, 508 U. S. 476, 487–488 (1993); *Jones* v. *Alfred H. Mayer Co*, 392 U. S. 409, 443–444 (1968); *Katzenbach* v. *Morgan*, 384 U. S. 641, 651 (1966); *South Carolina* v. *Katzenbach*, 383 U. S. 301, 326 (1966). It is true that where such legislative efforts classify persons on the basis of their race, we have mandated strict judicial scrutiny to ensure that the personal right to equal protection of the laws has not been infringed. *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 493–494 (1989) (plurality opinion). But it is not true that strict scrutiny is "strict in theory, but fatal in fact," *Fullilove* v. *Klutznick*, 448 U. S. 448, 519 (1980) (Marshall, J., concurring in judgment); cf. *post*, at 121 (THOMAS, J., concurring). It is only by applying strict scrutiny that we can distinguish between unconstitutional discrimination and narrowly tailored remedial programs that legislatures may enact to further the compelling governmental interest in redressing the effects of past discrimination.

Courts, however, are different. The necessary restrictions on our jurisdiction and authority contained in Article III of the Constitution limit the judiciary's institutional capacity to prescribe palliatives for societal ills. The unfortunate fact of racial imbalance and bias in our society, however pervasive or invidious, does not admit of judicial intervention absent a constitutional violation. Thus, even though the Civil War Amendments altered the balance of authority between federal and state *legislatures*, see *Ex parte Virginia*,

100 U. S. 339, 345 (1880), JUSTICE THOMAS cogently observes that "what the federal courts cannot do at the federal level they cannot do against the States; in either case, Article III courts are constrained by the inherent constitutional limitations on their powers." *Post*, at 132. Unlike Congress, which enjoys "'discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,'" *Croson, supra,* at 490 (quoting *Katzenbach* v. *Morgan, supra,* at 651), federal courts have no comparable license and must always observe their limited judicial role. Indeed, in the school desegregation context, federal courts are specifically admonished to "take into account the interests of state and local authorities in managing their own affairs," *Milliken* v. *Bradley,* 433 U. S. 267, 281 (1977) *(Milliken II),* in light of the intrusion into the area of education, "where States historically have been sovereign," *United States* v. *Lopez,* 514 U. S. 549, 564 (1995), and "to which States lay claim by right of history and expertise," *id.,* at 583 (KENNEDY, J., concurring).

In this case, it may be the "myriad factors of human existence," *Swann, supra,* at 22, that have prompted the white exodus from KCMSD, and the District Court cannot justify its transgression of the above constitutional principles simply by invoking desegregative attractiveness. The Court today discusses desegregative attractiveness only insofar as it supports the salary increase order under review, see *ante,* at 84, 89–90, and properly refrains from addressing the propriety of all the remedies that the District Court has ordered, revised, and extended in the 18-year history of this case. These remedies may also be improper to the extent that they serve the same goals of desegregative attractiveness and suburban comparability that we hold today to be impermissible, and, conversely, the District Court may be able to justify some remedies without reliance on these goals. But these are questions that the Court rightly leaves to be answered on remand. For now, it is enough to affirm the

principle that "the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation." *Milliken II, supra,* at 280.

For these reasons, I join the opinion of the Court.

JUSTICE THOMAS, concurring.

It never ceases to amaze me that the courts are so willing to assume that anything that is predominantly black must be inferior. Instead of focusing on remedying the harm done to those black schoolchildren injured by segregation, the District Court here sought to convert the Kansas City, Missouri, School District (KCMSD) into a "magnet district" that would reverse the "white flight" caused by *de*segregation. In this respect, I join the Court's decision concerning the two remedial issues presented for review. I write separately, however, to add a few thoughts with respect to the overall course of this litigation. In order to evaluate the scope of the remedy, we must understand the scope of the constitutional violation and the nature of the remedial powers of the federal courts.

Two threads in our jurisprudence have produced this unfortunate situation, in which a District Court has taken it upon itself to experiment with the education of the KCMSD's black youth. First, the court has read our cases to support the theory that black students suffer an unspecified psychological harm from segregation that retards their mental and educational development. This approach not only relies upon questionable social science research rather than constitutional principle, but it also rests on an assumption of black inferiority. Second, we have permitted the federal courts to exercise virtually unlimited equitable powers to remedy this alleged constitutional violation. The exercise of this authority has trampled upon principles of federalism and the separation of powers and has freed courts to pursue other agendas unrelated to the narrow purpose of precisely remedying a constitutional harm.

## I

## A

The mere fact that a school is black does not mean that it is the product of a constitutional violation. A "racial imbalance does not itself establish a violation of the Constitution." *United States* v. *Fordice,* 505 U. S. 717, 745 (1992) (THOMAS, J., concurring). Instead, in order to find unconstitutional segregation, we require that plaintiffs "prove all of the essential elements of *de jure* segregation—that is, stated simply, a current condition of segregation resulting from *intentional state action directed specifically* to the [allegedly segregated] schools." *Keyes* v. *School Dist. No. 1, Denver,* 413 U. S. 189, 205–206 (1973) (emphasis added). "[T]he differentiating factor between *de jure* segregation and so-called *de facto* segregation . . . is *purpose* or *intent* to segregate." *Id.,* at 208 (emphasis in original).

In the present case, the District Court inferred a continuing constitutional violation from two primary facts: the existence of *de jure* segregation in the KCMSD prior to 1954, and the existence of *de facto* segregation today. The District Court found that in 1954, the KCMSD operated 16 segregated schools for black students, and that in 1974 39 schools in the district were more than 90% black. Desegregation efforts reduced this figure somewhat, but the District Court stressed that 24 schools remained "racially isolated," that is, more than 90% black, in 1983–1984. *Jenkins* v. *Missouri,* 593 F. Supp. 1485, 1492–1493 (WD Mo. 1984). For the District Court, it followed that the KCMSD had not dismantled the dual system entirely. *Id.,* at 1493. The District Court also concluded that because of the KCMSD's failure to "become integrated on a system-wide basis," the dual system still exerted "lingering effects" upon KCMSD black students, whose "general attitude of inferiority" produced "low achievement . . . which ultimately limits employment opportunities and causes poverty." *Id.,* at 1492.

Without more, the District Court's findings could not have supported a finding of liability against the State. It should by now be clear that the existence of one-race schools is not by itself an indication that the State is practicing segregation. See, *e. g., Swann* v. *Charlotte-Mecklenburg Bd. of Ed.,* 402 U. S. 1, 26 (1971); *Pasadena City Bd. of Ed.* v. *Spangler,* 427 U. S. 424, 435–437 (1976); *Freeman* v. *Pitts,* 503 U. S. 467, 493–494 (1992). The continuing "racial isolation" of schools after *de jure* segregation has ended may well reflect voluntary housing choices or other private decisions. Here, for instance, the demography of the entire KCMSD has changed considerably since 1954. Though blacks accounted for only 18.9% of KCMSD's enrollment in 1954, by 1983–1984 the school district was 67.7% black. 593 F. Supp., at 1492, 1495. That certain schools are overwhelmingly black in a district that is now more than two-thirds black is hardly a sure sign of intentional state action.

In search of intentional state action, the District Court linked the State and the dual school system of 1984 in two ways. First, the court found that "[i]n the past" the State had placed its "imprimatur on racial discrimination." As the court explained, laws from the Jim Crow era created "an atmosphere in which . . . private white individuals could justify their bias and prejudice against blacks," with the possible result that private realtors, bankers, and insurers engaged in more discriminatory activities than would otherwise have occurred. *Id.,* at 1503. But the District Court itself acknowledged that the State's alleged encouragement of private discrimination was a fairly tenuous basis for finding liability. *Ibid.* The District Court therefore rested the State's liability on the simple fact that the State had intentionally created the dual school system before 1954, and had failed to fulfill "its affirmative duty of disestablishing a dual school system subsequent to 1954." *Id.,* at 1504. According to the District Court, the schools whose student bodies were

more than 90% black constituted "vestiges" of the prior *de jure* segregation, which the State and the KCMSD had an obligation to eliminate. *Id.*, at 1504, 1506. Later, in the course of issuing its first "remedial" order, the District Court added that a "system wide reduction in student achievement in the schools of . . . KCMSD" was also a vestige of the prior *de jure* segregation. *Jenkins* v. *Missouri*, 639 F. Supp. 19, 24 (WD Mo. 1985) (emphasis deleted).[1] In a subsequent order, the District Court indicated that post-1954 "white flight" was another vestige of the pre-1954 segregated system. 1 App. 126.

In order for a "vestige" to supply the ground for an exercise of remedial authority, it must be clearly traceable to the dual school system. The "vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied." *Freeman* v. *Pitts*, 503 U. S., at 496. District courts must not confuse the consequences of *de jure* segregation with the results of larger social forces or of private decisions. "It is simply not always the case that demographic forces causing population change bear any real and substantial relation to a *de jure* violation." *Ibid.*; accord, *id.*, at 501 (SCALIA, J., concurring); *Columbus Bd. of Ed.* v. *Penick*, 443 U. S. 449, 512 (1979) (REHNQUIST, J., dissenting); *Pasadena City Bd. of Ed.* v. *Spangler, supra*, at 435–436. As state-enforced segregation recedes further into the past, it is more likely that "these kinds of continuous and massive demographic shifts," *Freeman*, 503 U. S., at 495, will be the real source of racial imbalance or of poor educational performance in a school dis-

---

[1] It appears that the low achievement levels were never properly attributed to any discriminatory actions on the part of the State or of KCMSD. The District Court simply found that the KCMSD's test scores were below national norms in reading and mathematics. 639 F. Supp., at 25. Without more, these statistics are meaningless.

trict. And as we have emphasized, "[i]t is beyond the authority and beyond the practical ability of the federal courts to try to counteract" these social changes. *Ibid.*

When a district court holds the State liable for discrimination almost 30 years after the last official state action, it must do more than show that there are schools with high black populations or low test scores. Here, the District Judge did not make clear how the high black enrollments in certain schools were fairly traceable to the State of Missouri's actions. I do not doubt that Missouri maintained the despicable system of segregation until 1954. But I question the District Court's conclusion that because the State had enforced segregation until 1954, its actions, or lack thereof, proximately caused the "racial isolation" of the predominantly black schools in 1984. In fact, where, as here, the finding of liability comes so late in the day, I would think it incumbent upon the District Court to explain how more recent social or demographic phenomena did not cause the "vestiges." This the District Court did not do.

## B

Without a basis in any real finding of intentional government action, the District Court's imposition of liability upon the State of Missouri improperly rests upon a theory that racial imbalances are unconstitutional. That is, the court has "indulged the presumption, often irrebuttable in practice, that a presently observed [racial] imbalance has been proximately caused by intentional state action during the prior *de jure* era." *United States* v. *Fordice,* 505 U. S., at 745 (THOMAS, J., concurring) (citing *Dayton Bd. of Ed.* v. *Brinkman,* 443 U. S. 526, 537 (1979), and *Keyes* v. *School Dist. No. 1,* 413 U. S., at 211). In effect, the court found that racial imbalances constituted an ongoing constitutional violation that continued to inflict harm on black students.

This position appears to rest upon the idea that any school that is black is inferior, and that blacks cannot succeed without the benefit of the company of whites.

The District Court's willingness to adopt such stereotypes stemmed from a misreading of our earliest school desegregation case. In *Brown* v. *Board of Education*, 347 U. S. 483 (1954) *(Brown I)*, the Court noted several psychological and sociological studies purporting to show that *de jure* segregation harmed black students by generating "a feeling of inferiority" in them. Seizing upon this passage in *Brown I*, the District Court asserted that "forced segregation ruins attitudes and is inherently unequal." 593 F. Supp., at 1492. The District Court suggested that this inequality continues in full force even after the end of *de jure* segregation:

> "The general attitude of inferiority among blacks produces low achievement which ultimately limits employment opportunities and causes poverty. While it may be true that poverty results in low achievement regardless of race, it is undeniable that most poverty-level families are black. The District stipulated that as of 1977 they had not eliminated all the vestiges of the prior dual system. The Court finds the inferior education indigenous of the state-compelled dual school system has lingering effects in the [KCMSD]." *Ibid.* (citations omitted).

Thus, the District Court seemed to believe that black students in the KCMSD would continue to receive an "inferior education" despite the end of *de jure* segregation, as long as *de facto* segregation persisted. As the District Court later concluded, compensatory educational programs were necessary "as a means of remedying many of the educational problems which go hand in hand with racially isolated minority student populations." 639 F. Supp., at 25. Such assumptions and any social science research upon which they rely

certainly cannot form the basis upon which we decide matters of constitutional principle.[2]

It is clear that the District Court misunderstood the meaning of *Brown I*. *Brown I* did not say that "racially isolated" schools were inherently inferior; the harm that it identified was tied purely to *de jure* segregation, not *de facto* segregation. Indeed, *Brown I* itself did not need to rely upon any psychological or social-science research in order to announce the simple, yet fundamental, truth that the government cannot discriminate among its citizens on the basis of race. See McConnell, Originalism and the Desegregation Decisions, 81 Va. L. Rev. 947 (1995). As the Court's unanimous opinion indicated: "[I]n the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal." *Brown I, supra*, at 495. At the heart of this interpretation of the Equal Protection Clause lies the principle that the government must treat citi-

---

[2] The studies cited in *Brown I* have received harsh criticism. See, *e. g.*, Yudof, School Desegregation: Legal Realism, Reasoned Elaboration, and Social Science Research in the Supreme Court, 42 Law & Contemp. Prob. 57, 70 (Autumn 1978); L. Graglia, Disaster by Decree: The Supreme Court Decisions on Race and the Schools 27–28 (1976). Moreover, there simply is no conclusive evidence that desegregation either has sparked a permanent jump in the achievement scores of black children, or has remedied any psychological feelings of inferiority black schoolchildren might have had. See, *e. g.*, Bradley & Bradley, The Academic Achievement of Black Students in Desegregated Schools, 47 Rev. Educational Research 399 (1977); N. St. John, School Desegregation: Outcomes for Children (1975); Epps, The Impact of School Desegregation on Aspirations, Self-Concepts and Other Aspects of Personality, 39 Law & Contemp. Prob. 300 (Spring 1975). Contra, Crain & Mahard, Desegregation and Black Achievement: A Review of the Research, 42 Law & Contemp. Prob. 17 (Summer 1978); Crain & Mahard, The Effect of Research Methodology on Desegregation-Achievement Studies: A Meta-Analysis, 88 Am. J. of Sociology 839 (1983). Although the gap between black and white test scores has narrowed over the past two decades, it appears that this has resulted more from gains in the socioeconomic status of black families than from desegregation. See Armor, Why is Black Educational Achievement Rising?, 108 The Public Interest 65, 77–79 (Summer 1992).

zens as individuals, and not as members of racial, ethnic, or religious groups. It is for this reason that we must subject all racial classifications to the strictest of scrutiny, which (aside from two decisions rendered in the midst of wartime, see *Hirabayashi* v. *United States*, 320 U. S. 81 (1943); *Korematsu* v. *United States*, 323 U. S. 214 (1944)) has proven automatically fatal.

Segregation was not unconstitutional because it might have caused psychological feelings of inferiority. Public school systems that separated blacks and provided them with superior educational resources—making blacks "feel" superior to whites sent to lesser schools—would violate the Fourteenth Amendment, whether or not the white students felt stigmatized, just as do school systems in which the positions of the races are reversed. Psychological injury or benefit is irrelevant to the question whether state actors have engaged in intentional discrimination—the critical inquiry for ascertaining violations of the Equal Protection Clause. The judiciary is fully competent to make independent determinations concerning the existence of state action without the unnecessary and misleading assistance of the social sciences.

Regardless of the relative quality of the schools, segregation violated the Constitution because the State classified students based on their race. Of course, segregation additionally harmed black students by relegating them to schools with substandard facilities and resources. But neutral policies, such as local school assignments, do not offend the Constitution when individual private choices concerning work or residence produce schools with high black populations. See *Keyes* v. *School Dist. No. 1*, 413 U. S., at 211. The Constitution does not prevent individuals from choosing to live together, to work together, or to send their children to school together, so long as the State does not interfere with their choices on the basis of race.

Given that desegregation has not produced the predicted leaps forward in black educational achievement, there is no

reason to think that black students cannot learn as well when surrounded by members of their own race as when they are in an integrated environment. Indeed, it may very well be that what has been true for historically black colleges is true for black middle and high schools. Despite their origins in "the shameful history of state-enforced segregation," these institutions can be "'both a source of pride to blacks who have attended them and a source of hope to black families who want the benefits of . . . learning for their children.'" *Fordice*, 505 U. S., at 748 (THOMAS, J., concurring) (citation omitted). Because of their "distinctive histories and traditions," *ibid.*, black schools can function as the center and symbol of black communities, and provide examples of independent black leadership, success, and achievement.

Thus, even if the District Court had been on firmer ground in identifying a link between the KCMSD's pre-1954 *de jure* segregation and the present "racial isolation" of some of the district's schools, mere *de facto* segregation (unaccompanied by discriminatory inequalities in educational resources) does not constitute a continuing harm after the end of *de jure* segregation. "Racial isolation" itself is not a harm; only state-enforced segregation is. After all, if separation itself is a harm, and if integration therefore is the only way that blacks can receive a proper education, then there must be something inferior about blacks. Under this theory, segregation injures blacks because blacks, when left on their own, cannot achieve. To my way of thinking, that conclusion is the result of a jurisprudence based upon a theory of black inferiority.

This misconception has drawn the courts away from the important goal in desegregation. The point of the Equal Protection Clause is not to enforce strict race-mixing, but to ensure that blacks and whites are treated equally by the State without regard to their skin color. The lower courts should not be swayed by the easy answers of social science,

nor should they accept the findings, and the assumptions, of sociology and psychology at the price of constitutional principle.

## II

We have authorized the district courts to remedy past *de jure* segregation by reassigning students in order to eliminate or decrease observed racial imbalances, even if present methods of pupil assignment are facially neutral. See *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1 (1971); *Green* v. *School Bd. of New Kent Cty.*, 391 U. S. 430 (1968). The District Court here merely took this approach to its logical next step. If racial proportions are the goal, then schools must improve their facilities to attract white students until the district's racial balance is restored to the "right" proportions. Thus, fault for the problem we correct today lies not only with a twisted theory of racial injuries, but also with our approach to the remedies necessary to correct racial imbalances.

The District Court's unwarranted focus on the psychological harm to blacks and on racial imbalances has been only half of the tale. Not only did the court subscribe to a theory of injury that was predicated on black inferiority, it also married this concept of liability to our expansive approach to remedial powers. We have given the federal courts the freedom to use any measure necessary to reverse problems—such as racial isolation or low educational achievement—that have proven stubbornly resistant to government policies. We have not permitted constitutional principles such as federalism or the separation of powers to stand in the way of our drive to reform the schools. Thus, the District Court here ordered massive expenditures by local and state authorities, without congressional or executive authorization and without any indication that such measures would attract whites back to KCMSD or raise KCMSD test scores. The time has come for us to put the genie back in the bottle.

## A

The Constitution extends "[t]he judicial Power of the United States" to "all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made . . . under their Authority." Art. III, §§ 1, 2. I assume for purposes of this case that the remedial authority of the federal courts is inherent in the "judicial Power," as there is no general equitable remedial power expressly granted by the Constitution or by statute. As with any inherent judicial power, however, we ought to be reluctant to approve its aggressive or extravagant use, and instead we should exercise it in a manner consistent with our history and traditions. See *Chambers* v. *NASCO, Inc.*, 501 U. S. 32, 63–76 (1991) (KENNEDY, J., dissenting); *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S. 787, 815–825 (1987) (SCALIA, J., concurring in judgment).

Motivated by our worthy desire to eradicate segregation, however, we have disregarded this principle and given the courts unprecedented authority to shape a remedy in equity. Although at times we have invalidated a decree as beyond the bounds of an equitable remedy, see *Milliken* v. *Bradley*, 418 U. S. 717 (1974) *(Milliken I)*, these instances have been far outnumbered by the expansions in the equity power. In *United States* v. *Montgomery County Bd. of Ed.*, 395 U. S. 225 (1969), for example, we allowed federal courts to desegregate faculty and staff according to specific mathematical ratios, with the ultimate goal that each school in the system would have roughly the same proportions of white and black faculty. In *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, *supra*, we permitted federal courts to order busing, to set racial targets for school populations, and to alter attendance zones. And in *Milliken* v. *Bradley*, 433 U. S. 267 (1977) *(Milliken II)*, we approved the use of remedial or compensatory education programs paid for by the State.

In upholding these court-ordered measures, we indicated that trial judges had virtually boundless discretion in craft-

ing remedies once they had identified a constitutional violation. As *Swann* put it, "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." 402 U. S., at 15. We did say that "the nature of the violation determines the scope of the remedy," *id.*, at 16, but our very next sentence signaled how weak that limitation was: "In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system," *ibid.*

It is perhaps understandable that we permitted the lower courts to exercise such sweeping powers. Although we had authorized the federal courts to work toward "a system of determining admission to the public schools on a nonracial basis" in *Brown* v. *Board of Education,* 349 U. S. 294, 300–301 (1955) *(Brown II)*, resistance to *Brown I* produced little desegregation by the time we decided *Green* v. *School Bd. of New Kent Cty., supra.* Our impatience with the pace of desegregation and with the lack of a good-faith effort on the part of school boards led us to approve such extraordinary remedial measures. But such powers should have been temporary and used only to overcome the widespread resistance to the dictates of the Constitution. The judicial overreaching we see before us today perhaps is the price we now pay for our approval of such extraordinary remedies in the past.

Our prior decision in this litigation suggested that we would approve the continued use of these expansive powers even when the need for their exercise had disappeared. In *Missouri* v. *Jenkins,* 495 U. S. 33 (1990) *(Jenkins II)*, the District Court in this litigation had ordered an increase in local property taxes in order to fund its capital improvements plan. KCMSD, which had been ordered by the Court to finance 25% of the plan, could not pay its share due to state constitutional and statutory provisions placing a cap on property taxes. *Id.*, at 38, 41. Although we held that principles

of comity barred the District Court from imposing the tax increase itself (except as a last resort), we also concluded that the court could order KCMSD to raise taxes, and could enjoin the state laws preventing KCMSD from doing so. With little analysis, we held that "a court order directing a local government body to levy its own taxes is plainly a judicial act within the power of a federal court." *Id.*, at 55.

Our willingness to unleash the federal equitable power has reached areas beyond school desegregation. Federal courts have used "structural injunctions," as they are known, not only to supervise our Nation's schools, but also to manage prisons, see *Hutto* v. *Finney*, 437 U. S. 678 (1978), mental hospitals, *Thomas S.* v. *Flaherty*, 902 F. 2d 250 (CA4), cert. denied, 498 U. S. 951 (1990), and public housing, *Hills* v. *Gautreaux*, 425 U. S. 284 (1976). See generally D. Horowitz, The Courts and Social Policy 4–9 (1977). Judges have directed or managed the reconstruction of entire institutions and bureaucracies, with little regard for the inherent limitations on their authority.

## B

Such extravagant uses of judicial power are at odds with the history and tradition of the equity power and the Framers' design. The available historical records suggest that the Framers did not intend federal equitable remedies to reach as broadly as we have permitted. Anticipating the growth of our modern doctrine, the Anti-Federalists criticized the Constitution because it might be read to grant broad equitable powers to the federal courts. In response, the defenders of the Constitution "sold" the new framework of government to the public by espousing a narrower interpretation of the equity power. When an attack on the Constitution is followed by an open Federalist effort to narrow the provision, the appropriate conclusion is that the drafters and ratifiers of the Constitution approved the more limited construction offered in response. See *McIntyre* v. *Ohio*

*Elections Comm'n,* 514 U. S. 334, 367 (1995) (THOMAS, J., concurring in judgment).

The rise of the English equity courts as an alternative to the rigors of the common law, and the battle between the courts of equity and the courts of common law, is by now a familiar tale. See T. Plucknett, A Concise History of the Common Law 191–198, 673–694 (5th ed. 1956). By the middle of the 18th century, equity had developed into a precise legal system encompassing certain recognized categories of cases, such as those involving special property forms (trusts) or those in which the common law did not provide relief (fraud, forgery, or mistake). See 5 W. Holdsworth, History of English Law 300–338 (1927); S. Milsom, Historical Foundations of the Common Law 85–87 (1969); J. Baker, An Introduction to English Legal History 93–95 (2d ed. 1979). In this fixed system, each of these specific actions then called for a specific equitable remedy.

Blackstone described the principal differences between courts of law and courts of equity as lying only in the "modes of administering justice,"—"in the mode of proof, the mode of trial, and the mode of relief." 3 W. Blackstone, Commentaries on the Laws of England 436 (1768). As to the last, the English jurist noted that courts of equity held a concurrent jurisdiction when there is a "want of a more specific remedy, than can be obtained in the courts of law." *Id.,* at 438. Throughout his discussion, Blackstone emphasized that courts of equity must be governed by rules and precedents no less than the courts of law. "[I]f a court of equity were still at sea, and floated upon the occasional opinion which the judge who happened to preside might entertain of conscience in every particular case, the inconvenience that would arise from this uncertainty, would be a worse evil than any hardship that could follow from rules too strict and inflexible." *Id.,* at 440. If their remedial discretion had not been cabined, Blackstone warned, equity courts would have under-

mined the rule of law and produced arbitrary government. "[The judiciary's] powers would have become too arbitrary to have been endured in a country like this, which boasts of being governed in all respects by law and not by will." *Ibid.* (footnote omitted); see also 1 *id.*, at 61–62.[3]

So cautioned, the Framers approached equity with suspicion. As Thomas Jefferson put it: "Relieve the judges from the rigour of text law, and permit them, with pretorian discretion, to wander into it's equity, and the whole legal system becomes incertain." 9 Papers of Thomas Jefferson 71 (J. Boyd ed. 1954). Suspicion of judicial discretion led to criticism of Article III during the ratification of the Constitution. Anti-Federalists attacked the Constitution's extension of the federal judicial power to "Cases, in Law and Equity," arising under the Constitution and federal statutes. According to the Anti-Federalists, the reference to equity granted federal judges excessive discretion to deviate from the requirements of the law. Said the "Federal Farmer," "by thus joining the word equity with the word law, if we mean any thing, we seem to mean to give the judge a discretionary power." Federal Farmer No. 15, Jan. 18, 1788, in 2 The Complete Anti-Federalist 322 (H. Storing ed. 1981) (hereinafter Storing). He hoped that the Constitution's mention of equity jurisdiction was not "intended to lodge an arbitrary power or discretion in the judges, to decide as their conscience, their opinions, their caprice, or their politics might dictate." *Id.*, at 322–323.[4] Another Anti-Federalist, Brutus, argued that the

---

[3] As Blackstone wrote: "[A] set of great and eminent lawyers . . . have by degrees erected the system of relief administered by a court of equity into a regular science, which cannot be attained without study and experience, any more than the science of law: but from which, when understood, it may be known what remedy a suitor is entitled to expect, and by what mode of suit, as readily and with as much precision, in a court of equity as in a court of law." 3 Blackstone, at 440–441.

[4] The Federal Farmer particularly feared the combination of equity and law in the same federal courts: "It is a very dangerous thing to vest in the same judge power to decide on the law, and also general powers in

equity power would allow federal courts to "explain the constitution according to the reasoning spirit of it, without being confined to the words or letter." Brutus No. 11, Jan. 31, 1788, *id.*, at 419. This, predicted Brutus, would result in the growth of federal power and the "entire subversion of the legislative, executive and judicial powers of the individual states." *Id.*, at 420. See G. McDowell, Equity and the Constitution 43–44 (1982).

These criticisms provoked a Federalist response that explained the meaning of Article III's words. Answering the Anti-Federalist challenge in The Federalist Papers, Alexander Hamilton described the narrow role that the federal judicial power would play. Initially, Hamilton conceded that the federal courts would have some freedom in interpreting the laws and that federal judges would have lifetime tenure. The Federalist No. 78, p. 528 (J. Cooke ed. 1961). Nonetheless, Hamilton argued (as Blackstone had in describing the English equity courts) that rules and established practices would limit and control the judicial power: "To avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them." *Id.*, at 529. Cf. 1 J. Story, Commentaries on Equity Jurisprudence §§ 18–20, pp. 15–17 (I. Redfield 9th ed. 1866). Hamilton emphasized that "[t]he great and primary use of a court of equity is to give relief *in extraordinary cases*," and that "the principles by which that relief is governed are now reduced to a regular system." The Federalist No. 83, at 569, and n.

---

equity; for if the law restrain him, he is only to step into his shoes of equity, and give what judgment his reason or opinion may dictate; we have no precedents in this country, as yet, to regulate the divisions in equity as in Great Britain; equity, therefore, in the supreme court for many years will be mere discretion." Federal Farmer No. 3, Oct. 10, 1787, in 2 Storing 244. In such a system, the Anti-Federalist writer concluded, there would not be "a spark of freedom" to be found. *Ibid.*

In response to Anti-Federalist concerns that equity would permit federal judges an unchecked discretion, Hamilton explicitly relied upon the precise nature of the equity system that prevailed in England and had been transplanted in America. Equity jurisdiction was necessary, Hamilton argued, because litigation "between individuals" often would contain claims of "*fraud, accident, trust* or *hardship,* which would render the matter an object of equitable, rather than of legal jurisdiction." *Id.,* No. 80, at 539. "In such cases," Hamilton concluded, "where foreigners were concerned on either side, it would be impossible for the federal judicatories to do justice without an equitable, as well as a legal jurisdiction." *Id.,* at 540. Thus, Hamilton sought to narrow the expansive Anti-Federalist reading of inherent judicial equity power by demonstrating that the defined nature of the English and colonial equity system—with its specified claims and remedies—would continue to exist under the federal judiciary. In line with the prevailing understanding of equity at the time, Hamilton described Article III "equity" as a jurisdiction over certain types of cases rather than as a broad remedial power. Hamilton merely repeated the well-known principle that equity would be controlled no less by rules and practices than was the common law.

In light of this historical evidence, it should come as no surprise that there is no early record of the exercise of broad remedial powers. Certainly there were no "structural injunctions" issued by the federal courts, nor were there any examples of continuing judicial supervision and management of governmental institutions. Such exercises of judicial power would have appeared to violate principles of state sovereignty and of the separation of powers as late in the day as the turn of the century. "Born out of the desegregation litigation in the 1950's and 1960's, suits for affirmative injunctions were virtually unknown when the Court decided *Ex parte Young,* [209 U. S. 123, 158 (1908)]." Dwyer, Pendent Jurisdiction and the Eleventh Amendment, 75 Calif. L. Rev.

129, 162 (1987) (footnotes omitted). Indeed, it appears that the Framers continued to follow English equity practice well after the Ratification. See, *e. g., Robinson* v. *Campbell,* 3 Wheat. 212, 221–223 (1818). At the very least, given the Federalists' public explanation during the ratification of the federal equity power, we should exercise the power to impose equitable remedies only sparingly, subject to clear rules guiding its use.

## C

Two clear restraints on the use of the equity power—federalism and the separation of powers—derive from the very form of our Government. Federal courts should pause before using their inherent equitable powers to intrude into the proper sphere of the States. We have long recognized that education is primarily a concern of local authorities. "[L]ocal autonomy of school districts is a vital national tradition." *Dayton Bd. of Ed.* v. *Brinkman,* 433 U. S. 406, 410 (1977); see also *United States* v. *Lopez,* 514 U. S. 549, 580 (1995) (KENNEDY, J., concurring); *Milliken I,* 418 U. S., at 741–742; *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 50 (1973); *ante,* at 113 (O'CONNOR, J., concurring). A structural reform decree eviscerates a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds to the desegregation plan at the expense of other citizens, other government programs, and other institutions not represented in court. See Dwyer, *supra,* at 163. When district courts seize complete control over the schools, they strip state and local governments of one of their most important governmental responsibilities, and thus deny their existence as independent governmental entities.

Federal courts do not possess the capabilities of state and local governments in addressing difficult educational problems. State and local school officials not only bear the responsibility for educational decisions, they also are better equipped than a single federal judge to make the day-to-day

policy, curricular, and funding choices necessary to bring a school district into compliance with the Constitution. See *Wright* v. *Council of Emporia*, 407 U. S. 451, 477–478 (1972) (Burger, C. J., dissenting).[5] Federal courts simply cannot gather sufficient information to render an effective decree, have limited resources to induce compliance, and cannot seek political and public support for their remedies. See generally P. Schuck, Suing Government 150–181 (1983). When we presume to have the institutional ability to set effective educational, budgetary, or administrative policy, we transform the least dangerous branch into the most dangerous one.

The separation of powers imposes additional restraints on the judiciary's exercise of its remedial powers. To be sure, this is not a case of one branch of Government encroaching on the prerogatives of another, but rather of the power of the Federal Government over the States. Nonetheless, what the federal courts cannot do at the federal level they cannot do against the States; in either case, Article III courts are constrained by the inherent constitutional limitations on their powers. There simply are certain things that courts, in order to remain courts, cannot and should not do. There

---

[5] Certain aspects of this desegregation plan—for example, compensatory educational programs and orders that the State pay for half of the costs—come perilously close to abrogating the State's Eleventh Amendment immunity from federal money damages awards. See *Edelman* v. *Jordan*, 415 U. S. 651, 677 (1974) ("[A] federal court's remedial power . . . may not include a retroactive award which requires the payment of funds from the state treasury"). Although we held in *Milliken II*, 433 U. S. 267 (1977), that such remedies did not run afoul of the Eleventh Amendment, *id.*, at 290, it is difficult to see how they constitute purely prospective relief rather than retrospective compensation. See P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1191–1192 (3d ed. 1988). Of course, the state treasury inevitably must fund a State's compliance with injunctions commanding prospective relief, see *Edelman, supra*, at 668, but that does not require a State to supply money to comply with orders that have a backward-looking, compensatory purpose.

is no difference between courts running school systems or prisons and courts running Executive Branch agencies.

In this case, not only did the District Court exercise the legislative power to tax, it also engaged in budgeting, staffing, and educational decisions, in judgments about the location and esthetic quality of the schools, and in administrative oversight and monitoring. These functions involve a legislative or executive, rather than a judicial, power. See generally *Jenkins II*, 495 U. S., at 65–81 (KENNEDY, J., concurring in part and concurring in judgment); Nagel, Separation of Powers and the Scope of Federal Equitable Remedies, 30 Stan. L. Rev. 661 (1978). As Alexander Hamilton explained the limited authority of the federal courts: "The courts must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body." The Federalist No. 78, at 526. Federal judges cannot make the fundamentally political decisions as to which priorities are to receive funds and staff, which educational goals are to be sought, and which values are to be taught. When federal judges undertake such local, day-to-day tasks, they detract from the independence and dignity of the federal courts and intrude into areas in which they have little expertise. Cf. Mishkin, Federal Courts as State Reformers, 35 Wash. & Lee L. Rev. 949 (1978).

It is perhaps not surprising that broad equitable powers have crept into our jurisprudence, for they vest judges with the discretion to escape the constraints and dictates of the law and legal rules. But I believe that we must impose more precise standards and guidelines on the federal equitable power, not only to restore predictability to the law and reduce judicial discretion, but also to ensure that constitutional remedies are actually targeted toward those who have been injured.

## D

The dissent's approval of the District Court's treatment of salary increases is typical of this Court's failure to place limits on the equitable remedial power. The dissent frames the inquiry thus: "The only issue, then, is whether the salary increases ordered by the District Court have been reasonably related to achieving" the goal of remedying a system-wide reduction in student achievement, "keeping in mind the broad discretion enjoyed by the District Court in exercising its equitable powers." *Post*, at 155. In response to its question, the dissent concludes that "it is difficult to see how the District Court abused its discretion" in either the 1992 or 1993 orders, *ibid.*, and characterizes the lower court's orders as "beyond reproach," *post*, at 158. When the standard of review is as vague as whether "federal-court decrees . . . directly address and relate to the constitutional violation," *Milliken II*, 433 U. S., at 281–282, it is difficult to ever find a remedial order "unreasonable." Such criteria provide district courts with little guidance, and provide appellate courts few principles with which to review trial court decisions. If the standard reduces to what one believes is a "fair" remedy, or what vaguely appears to be a good "fit" between violation and remedy, then there is little hope of imposing the constraints on the equity power that the Framers envisioned and that our constitutional system requires.

Contrary to the dissent's conclusion, the District Court's remedial orders are in tension with two commonsense principles. First, the District Court retained jurisdiction over the implementation and modification of the remedial decree, instead of terminating its involvement after issuing its remedy. Although briefly mentioned in *Brown II* as a temporary measure to overcome local resistance to desegregation, 349 U. S., at 301 ("During this period of transition, the courts will retain jurisdiction"), this concept of continuing judicial involvement has permitted the District Courts to revise their remedies constantly in order to reach some broad, ab-

stract, and often elusive goal. Not only does this approach deprive the parties of finality and a clear understanding of their responsibilities, but it also tends to inject the judiciary into the day-to-day management of institutions and local policies—a function that lies outside of our Article III competence. Cf. Fuller, The Forms and Limits of Adjudication, 92 Harv. L. Rev. 353 (1978).

Much of the District Court's overreaching in this case occurred because it employed this hit-or-miss method to shape, and reshape, its remedial decree.[6] Using its authority of continuing jurisdiction, the court pursued its goal of decreasing "racial isolation" regardless of the cost or of the difficulties of engineering demographic changes. Wherever possible, district courts should focus their remedial discretion on devising and implementing a unified remedy in a single decree. This method would still provide the lower courts with

---

[6] First, the District Court set out to achieve some unspecified levels of racial balance in the KCMSD schools and to raise the test scores of the school districts as a whole. 639 F. Supp. 19, 24, 38 (WD Mo. 1985). In order to achieve that goal, the court ordered quality education programs to address the "system wide reduction in student achievement" caused by segregation, even though the court never specified how or to what extent the dual system had actually done so. *Id.*, at 46–51. After the State had spent $220 million and KCMSD had achieved a AAA rating, see *ante*, at 75–76, the District Court decided that even further measures were needed. In 1986, it ordered a massive magnet school and capital improvement plan to attract whites into KCMSD. 1 App. 130–193. In 1987, the District Court decided that KCMSD needed better instructional staff and ordered salary assistance for teachers. *Ante*, at 78. In 1992, the District Court found that KCMSD was having trouble attracting faculty and staff, and ordered a round of salary increases for virtually all employees. *Ante*, at 80. Every year the District Court holds a proceeding to review budget proposals and educational policies for KCMSD, and it has formed a "desegregation monitoring committee" to assess the implementation of its decrees. One need only review the District Court's first remedial order in 1984 to comprehend the level of detail with which it has made decisions concerning construction, facilities, staffing, and educational policy. 639 F. Supp. 19; see also *Missouri* v. *Jenkins*, 495 U. S. 33, 60–61 (1990) (KENNEDY, J., concurring in part and concurring in judgment).

substantial flexibility to tailor a remedy to fit a violation, and courts could employ their contempt power to ensure compliance. To ensure that they do not overstep the boundaries of their Article III powers, however, district courts should refrain from exercising their authority in a manner that supplants the proper sphere reserved to the political branches, who have a coordinate duty to enforce the Constitution's dictates, and to the States, whose authority over schools we have long sought to preserve. Only by remaining aware of the limited nature of its remedial powers, and by giving the respect due to other governmental authorities, can the judiciary ensure that its desire to do good will not tempt it into abandoning its limited role in our constitutional Government.

Second, the District Court failed to target its equitable remedies in this case specifically to cure the harm suffered by the victims of segregation. Of course, the initial and most important aspect of any remedy will be to eliminate any invidious racial distinctions in matters such as student assignments, transportation, staff, resource allocation, and activities. This element of most desegregation decrees is fairly straightforward and has not produced many examples of overreaching by the district courts. It is the "compensatory" ingredient in many desegregation plans that has produced many of the difficulties in the case before us.

Having found that segregation "has caused a system wide reduction in student achievement in the schools of the KCMSD," 639 F. Supp., at 24, the District Court ordered the series of magnet school plans, educational programs, and capital improvements that the Court criticizes today because of their interdistrict nature. In ordering these programs, the District Court exceeded its authority by benefiting those who were not victims of discriminatory conduct. KCMSD as a whole may have experienced reduced achievement levels, but raising the test scores of the *entire* district is a goal that is not sufficiently tailored to restoring the *victims* of segregation to the position they would have occupied absent

discrimination. A school district cannot be discriminated against on the basis of its race, because a school district has no race. It goes without saying that only individuals can suffer from discrimination, and only individuals can receive the remedy.

Of course, a district court may see fit to order necessary remedies that have the side effect of benefiting those who were not victims of segregation. But the court cannot order broad remedies that indiscriminately benefit a school district as a whole, rather than the individual students who suffered from discrimination. Not only do such remedies tend to indicate "efforts to achieve broader purposes lying beyond" the scope of the violation, *Swann*, 402 U. S., at 22, but they also force state and local governments to work toward the benefit of those who have suffered no harm from their actions.

To ensure that district courts do not embark on such broad initiatives in the future, we should demand that remedial decrees be more precisely designed to benefit only those who have been victims of segregation. Race-conscious remedies for discrimination not only must serve a compelling governmental interest (which is met in desegregation cases), but also must be narrowly tailored to further that interest. See *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 509–510 (1989) (plurality opinion). In the absence of special circumstances, the remedy for *de jure* segregation ordinarily should not include educational programs for students who were not in school (or were even alive) during the period of segregation. Although I do not doubt that all KCMSD students benefit from many of the initiatives ordered by the court below, it is for the democratically accountable state and local officials to decide whether they are to be made available even to those who were never harmed by segregation.

### III

This Court should never approve a State's efforts to deny students, because of their race, an equal opportunity for an

education. But the federal courts also should avoid using racial equality as a pretext for solving social problems that do not violate the Constitution. It seems apparent to me that the District Court undertook the worthy task of providing a quality education to the children of KCMSD. As far as I can tell, however, the District Court sought to bring new funds and facilities into the KCMSD by finding a constitutional violation on the part of the State where there was none. Federal courts should not lightly assume that States have caused "racial isolation" in 1984 by maintaining a segregated school system in 1954. We must forever put aside the notion that simply because a school district today is black, it must be educationally inferior.

Even if segregation were present, we must remember that a deserving end does not justify all possible means. The desire to reform a school district, or any other institution, cannot so captivate the judiciary that it forgets its constitutionally mandated role. Usurpation of the traditionally local control over education not only takes the judiciary beyond its proper sphere, it also deprives the States and their elected officials of their constitutional powers. At some point, we must recognize that the judiciary is not omniscient, and that all problems do not require a remedy of constitutional proportions.

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

The Court's process of orderly adjudication has broken down in this case. The Court disposes of challenges to only two of the District Court's many discrete remedial orders by declaring that the District Court erroneously provided an interdistrict remedy for an intradistrict violation. In doing so, it resolves a foundational issue going to one element of the District Court's decree that we did not accept for review in this case, that we need not reach in order to answer the questions that we did accept for review, and that we specifi-

cally refused to consider when it was presented in a prior petition for certiorari. Since, under these circumstances, the respondent school district and pupils naturally came to this Court without expecting that a fundamental premise of a portion of the District Court's remedial order would become the focus of the case, the essence of the Court's misjudgment in reviewing and repudiating that central premise lies in its failure to have warned the respondents of what was really at stake. This failure lulled the respondents into addressing the case without sufficient attention to the foundational issue, and their lack of attention has now infected the Court's decision.

No one on the Court has had the benefit of briefing and argument informed by an appreciation of the potential breadth of the ruling. The deficiencies from which we suffer have led the Court effectively to overrule a unanimous constitutional precedent of 20 years' standing, which was not even addressed in argument, was mentioned merely in passing by one of the parties, and discussed by another of them only in a misleading way.

The Court's departures from the practices that produce informed adjudication would call for dissent even in a simple case. But in this one, with a trial history of more than 10 years of litigation, the Court's failure to provide adequate notice of the issue to be decided (or to limit the decision to issues on which certiorari was clearly granted) rules out any confidence that today's result is sound, either in fact or in law.

I

In 1984, 30 years after our decision in *Brown* v. *Board of Education*, 347 U. S. 483 (1954), the District Court found that the State of Missouri and the Kansas City, Missouri, School District (KCMSD) had failed to reform the segregated scheme of public school education in the KCMSD, previously mandated by the State, which had required black and white children to be taught separately according to race. *Jenkins*

v. *Missouri*, 593 F. Supp. 1485, 1490–1494, 1503–1505 (WD Mo. 1984).[1] After *Brown*, neither the State nor the KCMSD moved to dismantle this system of separate education "root and branch," *id.*, at 1505, despite their affirmative obligation to do that under the Constitution. *Green* v. *School Bd. of New Kent Cty.*, 391 U. S. 430, 437–438 (1968). "Instead, the [KCMSD] chose to operate some completely segregated schools and some integrated ones," *Jenkins*, 593 F. Supp., at 1492, using devices like optional attendance zones and liberal transfer policies to "allo[w] attendance patterns to continue on a segregated basis." *Id.*, at 1494. Consequently, on the 20th anniversary of *Brown* in 1974, 39 of the 77 schools in the KCMSD had student bodies that were more than 90 percent black, and 80 percent of all black schoolchildren in the KCMSD attended those schools. 593 F. Supp., at 1492–1493. Ten years later, in the 1983–1984 school year, 24 schools remained racially isolated with more than 90 percent black enrollment. *Id.*, at 1493. Because the State and the KCMSD intentionally created this segregated system of education, and subsequently failed to correct it, the District Court concluded that the State and the district had "defaulted in their obligation to uphold the Constitution." *Id.*, at 1505.

Neither the State nor the KCMSD appealed this finding of liability, after which the District Court entered a series of remedial orders aimed at eliminating the vestiges of segrega-

---

[1] In related litigation about the schools of St. Louis, the Eighth Circuit has noted that "[b]efore the Civil War, Missouri prohibited the creation of schools to teach reading and writing to blacks. Act of February 16, 1847, § 1, 1847 Mo. Laws 103. State-mandated segregation was first imposed in the 1865 Constitution, Article IX § 2. It was reincorporated in the Missouri Constitution of 1945: Article IX specifically provided that separate schools were to be maintained for 'white and colored children.' In 1952, the Missouri Supreme Court upheld the constitutionality of Article IX under the United States Constitution. Article IX was not repealed until 1976." *Liddell* v. *Missouri*, 731 F. 2d 1294, 1305–1306 (CA8 1984) (case citations and footnote omitted).

tion. Since the District Court found that segregation had caused, among other things, "a system wide *reduction* in student achievement in the schools of the KCMSD," *Jenkins* v. *Missouri,* 639 F. Supp. 19, 24 (WD Mo. 1985) (emphasis in original), it ordered the adoption, starting in 1985, of a series of remedial programs to raise educational performance. As the Court recognizes, the District Court acted well within the bounds of its equitable discretion in doing so, *ante,* at 90, 101; in *Milliken* v. *Bradley,* 433 U. S. 267 (1977) *(Milliken II),* we held that a district court is authorized to remedy all conditions flowing directly from the constitutional violations committed by state or local officials, including the educational deficits that result from a segregated school system (programs aimed to correct those deficits are therefore frequently referred to as *Milliken II* programs). *Id.,* at 281–283. Nor was there any objection to the District Court's orders from the State and the KCMSD, who agreed that it was " 'appropriate to include a number of properly targeted educational programs in [the] desegregation plan,' " *Jenkins,* 639 F. Supp., at 24 (quoting from the State's desegregation proposal). They endorsed many of the initiatives directed at improving student achievement that the District Court ultimately incorporated into its decree, including those calling for the attainment of AAA status for the KCMSD (a designation, conferred by the State Department of Elementary and Secondary Education upon consideration of a limited number of criteria, indicating "that a school system quantitatively and qualitatively has the resources necessary to provide minimum basic education to its students," *id.,* at 26), full day kindergarten, summer school, tutoring before and after school, early childhood development, and reduction in class sizes. *Id.,* at 24–26.

Between 1985 and 1987 the District Court also ordered the implementation of a magnet school concept, 1 App. 131–133 (Order of Nov. 12, 1986), and extensive capital improvements to the schools of the KCMSD. *Jenkins* v. *Missouri,* 672

F. Supp. 400, 405–408 (WD Mo. 1987); 1 App. 133–134 (Order of Nov. 12, 1986); *Jenkins*, 639 F. Supp., at 39–41. The District Court found that magnet schools would not only serve to remedy the deficiencies in student achievement in the KCMSD, but would also assist in desegregating the district by attracting white students back into the school system. See, *e. g.*, 1 App. 118 (Order of June 16, 1986) ("[C]ommitment, when coupled with quality planning and sufficient resources can result in the establishment of magnet schools which can attract non-minority enrollment as well as be an integral part of district-wide improved student achievement"); see also *Jenkins* v. *Missouri*, 855 F. 2d 1295, 1301 (CA8 1988) ("The foundation of the plans adopted was the idea that improving the KCMSD as a system would at the same time compensate the blacks for the education they had been denied and attract whites from within and without the KCMSD to formerly black schools").

The District Court, finding that the physical facilities in the KCMSD had "literally rotted," *Jenkins*, 672 F. Supp., at 411, similarly grounded its orders of capital improvements in the related remedial objects of improving student achievement and desegregating the KCMSD. *Jenkins*, 639 F. Supp., at 40 ("The improvement of school facilities is an important factor in the overall success of this desegregation plan. Specifically, a school facility which presents safety and health hazards to its students and faculty serves both as an obstacle to education as well as to maintaining and attracting non-minority enrollment. Further, conditions which impede the creation of a good learning climate, such as heating deficiencies and leaking roofs, reduce the effectiveness of the quality education components contained in this plan"); see also *Jenkins*, 855 F. 2d, at 1305 ("[T]he capital improvements [are] required both to improve the education available to the victims of segregation as well as to attract whites to the schools").

As a final element of its remedy, in 1987 the District Court ordered funding for increases in teachers' salaries as a step toward raising the level of student achievement. "[I]t is essential that the KCMSD have sufficient revenues to fund an operating budget which can provide quality education, including a high quality faculty." *Jenkins*, 672 F. Supp., at 410. Neither the State nor the KCMSD objected to increases in teachers' salaries as an element of the comprehensive remedy, or to this cost as an item in the desegregation budget.

In 1988, however, the State went to the Eighth Circuit with a broad challenge to the District Court's remedial concept of magnet schools and to its orders of capital improvements (though it did not appeal the salary order), arguing that the District Court had run afoul of *Milliken* v. *Bradley*, 418 U. S. 717 (1974) *(Milliken I)*, by ordering an interdistrict remedy for an intradistrict violation. The Eighth Circuit rejected the State's position, *Jenkins*, 855 F. 2d 1295, and in 1989 the State petitioned for certiorari.

The State's petition presented two questions for review, one challenging the District Court's authority to order a property tax increase to fund its remedial program, the other going to the legitimacy of the magnet school concept at the very foundation of the Court's desegregation plan:

> "For a purely intradistrict violation, the courts below have ordered remedies—costing hundreds of millions of dollars—with the stated goals of attracting more nonminority students to the school district and making programs and facilities comparable to those in neighboring districts . . . .
>
> "The questio[n] presented [is] . . . .
>
> ". . . Whether a federal court, remedying an intradistrict violation under *Brown* v. *Board of Education*, 347 U. S. 483 (1954), may

"a) impose a duty to attract additional non-minority students to a school district, and

"b) require improvements to make the district schools comparable to those in surrounding districts." Pet. for Cert. in *Missouri* v. *Jenkins*, O. T. 1988, No. 88–1150, p. i.

We accepted the taxation question, and decided that while the District Court could not impose the tax measure itself, it could require the district to tax property at a rate adequate to fund its share of the costs of the desegregation remedy. *Missouri* v. *Jenkins*, 495 U. S. 33, 50–58 (1990). If we had accepted the State's broader, foundational question going to the magnet school concept, we could also have made an informed decision on whether that element of the District Court's remedial scheme was within the limits of the Court's equitable discretion in response to the constitutional violation found. Each party would have briefed the question fully and would have identified in some detail those items in the record bearing on it. But none of these things happened. Instead of accepting the foundational question in 1989, we denied certiorari on it. *Missouri* v. *Jenkins*, 490 U. S. 1034.

The State did not raise that question again when it returned to this Court with its 1994 petition for certiorari, which led to today's decision. Instead, the State presented, and we agreed to review, these two questions:

"1. Whether a remedial educational desegregation program providing greater educational opportunities to victims of past de jure segregation than provided anywhere else in the country nonetheless fails to satisfy the Fourteenth Amendment (thus precluding a finding of partial unitary status) solely because student achievement in the District, as measured by results on standardized test scores, has not risen to some unspecified level?

"2. Whether a federal court order granting salary increases to virtually every employee of a school district—

including non-instructional personnel—as a part of a school desegregation remedy conflicts with applicable decisions of this court which require that remedial components must directly address and relate to the constitutional violation and be tailored to cure the condition that offends the Constitution?" Pet. for Cert. i.

These questions focus on two discrete issues: the extent to which a district court may look at students' test scores in determining whether a school district has attained partial unitary status as to its *Milliken II* educational programs, and whether the particular salary increases ordered by the District Court constitute a permissible component of its remedy.

The State did not go beyond these discrete issues, and it framed no broader, foundational question about the validity of the District Court's magnet concept. The Court decides, however, that it can reach that question of its own initiative, and it sees no bar to this course in the provision of this Court's Rule 14.1 that "[o]nly the questions set forth in the petition, or fairly included therein, will be considered . . . ." *Ante*, at 84–85. The broader issue, the Court claims, is "fairly included" in the State's salary question. But that claim does not survive scrutiny.

The standard under Rule 14.1 is quite simple: as the Court recognizes, we have held that an issue is fairly comprehended in a question presented when the issue must be resolved in order to answer the question. See *ibid.*, citing *Procunier* v. *Navarette*, 434 U. S. 555, 560, n. 6 (1978); *United States* v. *Mendenhall*, 446 U. S. 544, 551–552, n. 5 (1980). That should be the end of the matter here, since the State itself concedes that we can answer its salary and test-score questions without addressing the soundness of the magnet element of the District Court's underlying remedial scheme, see Brief for Petitioners 18 ("each question [presented] can be dealt with on its own terms . . ."). While the Court ignores that concession, it is patently correct. There

is no reason why we cannot take the questions as they come
to us; assuming the validity of the District Court's basic
remedial concept, we can determine the significance of test
scores and assess the salary orders in relation to that
concept.

Of course, as we understand necessity in prudential mat-
ters like this, it comes in degrees, and I would not deny that
sometimes differing judgments are possible about the need
to go beyond a question as originally accepted. But this
is not even arguably such a case. It is instead a case that
presents powerful reasons to confine discussion to the
questions taken.[2]

Quite naturally, the respondents here chose not to devote
any significant attention to a question not raised, and they
presumably had no reason to designate for printing those
portions of the record bearing on an issue not apparently
before us. And while respondents seemingly gave some
thought to the bare possibility that the Court would choose

---

[2] JUSTICE O'CONNOR suggests that I am saying something inconsistent
with the position I took in *Bray* v. *Alexandria Women's Health Clinic*,
506 U. S. 263 (1993), see *ante*, at 105, but her claim rests on a misunder-
standing of my position in that case. I did not think that in *Bray* we could
reach the question whether respondents' claims fell within the "prevention
clause" of 42 U. S. C. § 1985(3) simply because the question "'was briefed,
albeit sparingly, by the parties prior to the first oral argument.'" *Ante*,
at 105. Rather, I said that "[t]he applicability of the prevention clause is
fairly included within the questions presented, especially as restated by
respondents . . . ." *Bray, supra,* at 290 (SOUTER, J., concurring in judg-
ment in part and dissenting in part). Thus the question was literally
before us (as JUSTICE O'CONNOR believes the foundational question is be-
fore us under the second of the State's questions). What is not debatable
is that *Bray* was not preceded by prior litigation indicating we would not
consider the "prevention clause" issue, whereas this case was preceded by
a refusal to take the very foundational issue that JUSTICE O'CONNOR ar-
gues is within the literal terms of the second question focusing on salaries.
See *supra*, at 143–144. I obviously thought the Court was wrong to re-
ject supplemental briefing on the prevention clause, but that rejection was
a far cry from refusing to take the issue.

to deal with the discrete questions by going beyond them to a more comprehensive underlying issue, they were entitled to reject that possibility as a serious one for the very reason that the Court had already, in 1989, expressly refused to consider that foundational issue when the State expressly attempted to raise it. Our deliberate refusal to entertain so important an issue is and ought to be a reasonable basis to infer that we will not subsequently allow it to be raised on our own motion without saying so in advance and giving notice to a party whose interests might be adversely affected.

Thus the Court misses the point when it argues that the foundational issue is in a sense antecedent to the specific ones raised, and that those can be answered by finding error in some element of the underlying remedial scheme. Even if the Court were correct that the foundational issue could be reached under Rule 14.1, the critical question surely is whether that issue may fairly be decided without clear warning, at the culmination of a course of litigation in which this Court has specifically refused to consider the issue and given no indication of any subsequent change of mind. The answer is obviously no. And the Court's claim of necessity rings particularly hollow when one considers that if it really were essential to decide the foundational issue to address the two questions that are presented, the Court could give notice to the parties of its intention to reach the broader issue, and allow for adequate briefing and argument on it. And yet the Court does none of that, but simply decides the issue without any warning to respondents.

If there is any doubt about the lack of fairness and prudence displayed by the Court, it should disappear upon seeing two things: first, how readily the questions presented can be answered on their own terms, without giving any countenance to the State's now successful attempt to " 'smuggl[e] additional questions into a case after we grant[ed] certiorari,' " *Izumi Seimitsu Kogyo Kabushiki Kaisha* v. *U. S. Philips Corp.*, 510 U. S. 27, 34 (1993), quoting *Irvine* v. *Cali-*

*fornia,* 347 U. S. 128, 129 (1954) (plurality opinion of Jackson, J.); and, second, how the Court's decision to go beyond those questions to address an issue not adequately briefed or argued by one set of parties leads it to render an opinion anchored in neither the findings and evidence contained in the record, nor in controlling precedent, which is squarely at odds with the Court's holding today.

## II

### A

The test-score question as it comes to us is one of word play, not substance. While the Court insists that the District Court's Order of June 17, 1992 (the only order relevant to the test-score question on review here), "requir[ed] the State to continue to fund the quality education programs because student achievement levels [in the KCMSD] were still 'at or below national norms at many grade levels' . . . ," *ante,* at 100; see also *ante,* at 73, that order contains no discussion at all of student achievement levels in the KCMSD in comparison to national norms, and in fact does not explicitly address the subject of partial unitary status. App. to Pet. for Cert. A–69 to A–75. The reference to test scores "at or below national norms" comes from an entirely different and subsequent order of the District Court (dated Apr. 16, 1993) which is not under review. Its language presumably would not have been quoted to us, if the Court of Appeals's opinion affirming the District Court's June 17, 1992, order had not canvassed subsequent orders and mentioned the District Court's finding of fact that the "KCMSD is still at or below national norms at many grade levels," 11 F. 3d 755, 762 (CA8 1994), citing Order of Apr. 16, 1993, App. to Pet. for Cert. A–130. In any event, what is important here is that none of the District Court's or Court of Appeals's opinions or orders requires a certain level of test scores before unitary status can be found, or indicates that test scores are the only thing standing between the State and a finding of uni-

tary status as to the KCMSD's *Milliken II* programs. Indeed; the opinion concurring in the denial of rehearing en banc below (not mentioned by the Court, although it is certainly more probative of the governing law in the Eighth Circuit than the dissenting opinion on which the Court does rely) expressly disavows any dispositive role for test scores:

> "The dissent accepts, at least in part, the State's argument that the district court adopted a student achievement goal, measured by test scores, as the only basis for determining whether past discrimination has been remedied. . . . When we deal with student achievement in a quality education program in the context of relieving a school district of court supervision, test results must be considered. Test scores, however, must be only one factor in the equation. Nothing in this court's opinion, the district court's opinion, or the testimony of KCMSD's witnesses indicates that test results were the only criteria used in denying the State's claim that its obligation for the quality education programs should be ended by a declaration they are unitary." 19 F. 3d 393, 395 (1994) (Gibson, J., concurring in denial of rehearing en banc).

If, then, test scores do not explain why there was no finding of unitary status as to the *Milliken II* programs, one may ask what does explain it. The answer is quite straightforward. The Court of Appeals refused to order the District Court to enter a finding of partial unitary status as to the KCMSD's *Milliken II* programs (and apparently, the District Court did not speak to the issue itself) simply because the State did not attempt to make the showing required for that relief. As the Court recognizes, *ante*, at 88–89, we have established a clear set of procedures to be followed by governmental entities seeking the partial termination of a desegregation decree. In *Freeman* v. *Pitts*, 503 U. S. 467 (1992), we held that "[t]he duty and responsibility

of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system." *Id.*, at 485. Accordingly, before a district court may grant a school district (or other governmental entity) partial release from a desegregation decree, it must first consider "whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn . . . ." *Id.*, at 491. Full and satisfactory compliance, we emphasized in *Freeman*, is to be measured by " 'whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.' " *Id.*, at 492, quoting *Board of Ed. of Oklahoma City Public Schools* v. *Dowell*, 498 U. S. 237, 249–250 (1991). The district court must then consider "whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district [or other governmental entity] has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance." 503 U. S., at 491. The burden of showing that these conditions to finding partial unitary status have been met rests (as one would expect) squarely on the constitutional violator who seeks relief from the existing remedial order. *Id.*, at 494.

While the Court recognizes the three-part showing that the State must make under *Freeman* in order to get a finding of partial unitary status, *ante*, at 88–89, it fails to acknowledge that the State did not even try to make a *Freeman* showing in the litigation leading up to the District Court's Order of June 17, 1992. The District Court's order was triggered not by a motion for partial unitary status filed by the State, but by a motion filed by the KCMSD for approval of its desegregation plan for the 1992–1993 school year. See App. to Pet. for Cert. A–69. While the State's response to

that motion suggested that the District Court should enter a finding of partial unitary status as to the district's *Milliken II* component of its decree, State's Response to KCMSD Motion for Approval of Desegregation Plan for 1992–1993, pp. 1–20 (hereinafter State's Response), the State failed even to allege its compliance with two of the three prongs of the *Freeman* test.

The State did not claim that implementation of the *Milliken II* component of the decree had remedied the reduction in student achievement in the KCMSD to the extent practicable; it simply argued that various *Milliken II* programs had been implemented. State's Response 9–17. Accordingly, in the hearings held by the District Court on the KCMSD's motion, the State's expert witness testified only that the various *Milliken II* programs had been implemented and had increased educational opportunity in the district. 2 App. 439–483. With the exception of the "effective schools" program, he said nothing about the effects of those programs on student achievement, and in fact admitted on cross-examination that he did not have an opinion as to whether the programs had remedied to the extent practicable the reduction in student achievement caused by the segregation in the KCMSD.

> "Q: Dr. Stewart, do you, testifying on behalf of the State . . . have an opinion as to whether or not the educational deficits that you acknowledged were vestiges of the prior segregation have been eliminated to the extent practicable in the Kansas City School District?
>
> "A: No, that's not the purpose of my testimony, Mr. Benson." *Id.*, at 483.

Nor did the State focus on its own good faith in complying with the District Court's decree; it emphasized instead the district's commitment to the decree and to the constitutional provisions on which the decree rested. State's Response 8. The State, indeed, said nothing to contradict the very find-

ings made elsewhere by the District Court that have called the State's own commitment to the success of the decree into question. See, *e. g.*, 1 App. 136 (Order of Nov. 12, 1986) ("[D]uring the course of this lawsuit the Court has not been informed of one affirmative act voluntarily taken by the Executive Department of the State of Missouri or the Missouri General Assembly to aid a school district that is involved in a desegregation program"); see also App. to Pet. for Cert. A–123 (Order of Apr. 16, 1993) ("The State, also a constitutional violator, has historically opposed the implementation of any program offered to desegregate the KCMSD. The Court recognizes that the State has had to bear the brunt of the costs of desegregation due to the joint and several liability finding previously made by the Court. However, the State has *never* offered the Court a viable, even tenable, alternative and has been extremely antagonistic in its approach to effecting the desegregation of the KCMSD") (emphasis in original).

Thus, it was the State's failure to meet or even to recognize its burden under *Freeman* that led the Court of Appeals to reject the suggestion that it make a finding of partial unitary status as to the district's *Milliken II* education programs:

> "It is . . . significant that the testimony of [the State's expert] did no more than describe the successful establishment of the several educational programs, but gave no indication of whether these programs had succeeded in improving student achievement. . . .
>
> "The only evidence before the district court with respect to the degree of progress on elimination of vestiges of past discrimination was at best that a start had been made. The evidence on the record fell far short of establishing that such vestiges had been eliminated to the extent practicable. . . .

". . . [Further, the] State did not try to prove that it has demonstrated a good faith commitment to the whole of the court's decree. . . .

    .       .       .       .       .

". . . [T]he district court did not abuse its discretion in continuing the quality education programs." 11 F. 3d, at 764–765 (citations omitted).

Examining only the first *Freeman* prong, there can be no doubt that the Court of Appeals was correct. *Freeman* and *Dowell* make it entirely clear that the central focus of this prong of the unitary status enquiry is on effects: to the extent reasonably possible, a constitutional violator must remedy the ills caused by its actions before it can be freed of the court-ordered obligations it has brought upon itself. Under the logic of the State's arguments to the District Court, the moment the *Milliken II* programs were put in place, the State was at liberty to walk away from them, no matter how great the remaining consequences of segregation for educational quality or how great the potential for curing them if state funding continued.

Looking ahead, if indeed the State believes itself entitled to a finding of partial unitary status on the subject of educational programs, there is an orderly procedural course for it to follow. It may frame a proper motion for partial unitary status, and prepare to make a record sufficient to allow the District Court and the Court of Appeals to address the continued need for and efficacy of the *Milliken II* programs.

In the development of a proper unitary status record, test scores will undoubtedly play a role. It is true, as the Court recognizes, that all parties to this case agree that it would be error to require that the students in a school district attain the national average test score as a prerequisite to a finding of partial unitary status, if only because all sorts of causes independent of the vestiges of past school segregation might stand in the way of the goal. *Ante*, at 101–102. That

said, test scores will clearly be relevant in determining whether the improvement programs have cured a deficiency in student achievement to the practicable extent. The District Court has noted (in the finding that the Court would read as a dispositive requirement for unitary status) that while students' scores have shown a trend of improvement, they remain at or below national norms. App. to Pet. for Cert. A–131 (Order of Apr. 16, 1993). The significance of this fact is subject to assessment. Depending, of course, on other facts developed in the course of unitary status proceedings, the improvement to less than the national average might reasonably be taken to show that education programs are having a good effect on student achievement, and that further improvement can be expected. On the other hand, if test-score changes were shown to have flattened out, that might suggest the impracticability of any additional remedial progress. While the significance of scores is thus open to judgment, the judgment is not likely to be very sound unless it is informed by more of a record than we have in front of us, and the Court's admonition that the District Court should "sharply limit" its reliance on test scores, *ante*, at 101, should be viewed in this light.

B

The other question properly before us has to do with the propriety of the District Court's recent salary orders. While the Court suggests otherwise, *ante*, at 84, 100, the District Court did not ground its orders of salary increases solely on the goal of attracting students back to the KCMSD. From the start, the District Court has consistently treated salary increases as an important element in remedying the systemwide reduction in student achievement resulting from segregation in the KCMSD. As noted above, the Court does not question this remedial goal, which we expressly approved in *Milliken II*. See *supra*, at 141–143. The only issue, then, is whether the salary increases ordered by the District Court have been reasonably related to achieving

that goal, keeping in mind the broad discretion enjoyed by the District Court in exercising its equitable powers.

The District Court first ordered KCMSD salary increases, limited to teachers, in 1987, basing its decision on the need to raise the level of student achievement. "[I]t is essential that the KCMSD have sufficient revenues to fund an operating budget which can provide quality education, including a high quality faculty." *Jenkins,* 672 F. Supp., at 410. The State raised no objection to the District Court's order, and said nothing about the issue of salary increases in its 1988 appeal to the Eighth Circuit.

When the District Court's 1987 order expired in 1990, all parties, including the State, agreed to a further order increasing salaries for both instructional and noninstructional personnel through the 1991–1992 school year. 1 App. 332–337 (Order of July 23, 1990). In 1992 the District Court merely ordered that salaries in the KCMSD be maintained at the same level for the following year, rejecting the State's argument that desegregation funding for salaries should be discontinued, App. to Pet. for Cert. A–76 to A–93 (Order of June 25, 1992), and in 1993 the District Court ordered small salary increases for both instructional and noninstructional personnel through the end of the 1995–1996 school year, App. to Pet. for Cert. A–94 to A–109 (Order of June 30, 1993).

It is the District Court's 1992 and 1993 orders that are before us, and it is difficult to see how the District Court abused its discretion in either instance. The District Court had evidence in front of it that adopting the State's position and discontinuing desegregation funding for salary levels would result in their abrupt drop to 1986–1987 levels, with the resulting disparity between teacher pay in the district and the nationwide level increasing to as much as 40 to 45 percent, and a mass exodus of competent employees likely taking place. *Id.,* at A–76, A–78 to A–91. Faced with this evidence, the District Court found that continued desegregation funding of salaries, and small increases in those salaries

over time, were essential to the successful implementation of its remedial scheme, including the elevation of student achievement:

"[I]n the absence of desegregation funding for salaries, the District will not be able to implement its desegregation plan. . . .

. . . . .

"High quality personnel are necessary not only to implement specialized desegregation programs intended to 'improve educational opportunities and reduce racial isolation,' but also to 'ensure that there is no diminution in the quality of its regular academic program.' . . .

". . . There is no question but that a salary roll back would have effects that would drastically impair implementation of the desegregation remedy.

. . . . .

". . . A salary roll back would result in excessive employee turnover, a decline in the quality and commitment of work and an inability of the KCMSD to achieve the objectives of the desegregation plan." *Id.*, at A–86 to A–91 (Order of June 25, 1992), quoting *Jenkins,* 855 F. 2d, at 1301, and *Jenkins,* 672 F. Supp., at 410.

See also App. to Pet. for Cert. A–95 to A–97, A–101 to A–102 (Order of June 30, 1993). The Court of Appeals affirmed the District Court's orders on the basis of these findings, again taking special note of the importance of adequate salaries to the remedial goal of improving student achievement:

"[Q]uality education programs and magnet schools [are] a part of the remedy for the vestiges of segregation causing a system wide reduction in student achievement in the KCMSD schools. . . . The significant finding of the [district] court with respect to the earlier funding order was that the salary increases were essential to comply with the court's desegregation orders, and that high

quality teachers, administrators, and staff must be hired to improve the desegregative attractiveness of KCMSD.

.      .      .      .      .

". . . It is evident that the district court had before it substantial evidence of a statistically significant reduction in the turnover rates for full-time employees, a dramatic increase in the percentage of certified employees selecting KCMSD because of the salary increases, and a significant decline in the number of employees lost to other districts. Further, the court heard testimony that the average performance evaluation for the professional employees increased positively and significantly." 13 F. 3d 1170, 1172–1174 (CA8 1993).

See also 11 F. 3d, at 766–769.

There is nothing exceptionable in the lower courts' findings about the relationship between salaries and the District Court's remedial objectives, and certainly nothing in the record suggests obvious error as to the amounts of the increases ordered.[3] If it is tempting to question the place of salary increases for administrative and maintenance personnel in a desegregation order, the Court of Appeals addressed the temptation in specifically affirming the District Court's finding that such personnel are critical to the success of the desegregation effort, 13 F. 3d, at 1174 (referring to order of June 30, 1993, App. to Pet. for Cert. A–104), and did so in the circumstances of a district whose schools have been plagued by leaking roofs, defective lighting, and reeking

---

[3] There is no claim of anything unreasonable in the salary increases merely because the District Court has ordered them, whereas they might otherwise have been set by collective bargaining. For that matter, the Court of Appeals observed that the District Court has not replaced collective bargaining in the KCMSD with a rubber stamping of union requests, but rather has "juridically pruned applications of funding that have been presented to it," 13 F. 3d, at 1174, ordering salary increases that have been far smaller than those requested by the union. See, e. g., App. to Pet. for Cert. A–102, A–104 to A–106 (Order of June 30, 1993).

lavatories. See *Jenkins*, 855 F. 2d, at 1306; *Jenkins*, 672 F. Supp., at 403–404. As for teachers' increases, the District Court and the Court of Appeals were beyond reproach in finding and affirming that in order to remedy the educational deficits flowing from segregation in the KCMSD, "those persons charged with implementing the [remedial] plan [must] be the most qualified persons reasonably attainable," App. to Pet. for Cert. A–102.

Indeed, the Court does not question the District Court's salary orders insofar as they relate to the objective of raising the level of student achievement in the KCMSD, but rather overlooks that basis for the orders altogether. The Court suggests that the District Court rested its approval of salary increases only on the object of drawing students into the district's schools, *ante*, at 91, and rejects the increases for that reason. It seems clear, however, that the District Court and the Court of Appeals both viewed the salary orders as serving two complementary but distinct purposes, and to the extent that the District Court concludes on remand that its salary orders are justified by reference to the quality of education alone, nothing in the Court's opinion precludes those orders from remaining in effect.

### III

The two discrete questions that we actually accepted for review are, then, answerable on their own terms without any need to consider whether the District Court's use of the magnet school concept in its remedial plan is itself constitutionally vulnerable. The capacity to deal thus with the questions raised, coupled with the unfairness of doing otherwise without warning, are enough to demand a dissent.

But there is more to fuel dissent. On its face, the Court's opinion projects an appealing pragmatism in seeming to cut through the details of many facts by applying a rule of law that can claim both precedential support and intuitive sense, that there is error in imposing an interdistrict remedy to

cure a merely intradistrict violation. Since the District Court has consistently described the violation here as solely intradistrict, and since the object of the magnet schools under its plan includes attracting students into the district from other districts, the Court's result seems to follow with the necessity of logic, against which arguments about detail or calls for fair warning may not carry great weight.

The attractiveness of the Court's analysis disappears, however, as soon as we recognize two things. First, the District Court did not mean by an "intradistrict violation" what the Court apparently means by it today. The District Court meant that the violation within the KCMSD had not led to segregation outside of it, and that no other school districts had played a part in the violation. It did not mean that the violation had not produced effects of any sort beyond the district. Indeed, the record that we have indicates that the District Court understood that the violation here did produce effects spanning district borders and leading to greater segregation within the KCMSD, the reversal of which the District Court sought to accomplish by establishing magnet schools.[4] Insofar as the Court assumes that this

---

[4] This was not the only, or even the principal, purpose of the magnet schools. The District Court found that magnet schools would assist in remedying the deficiencies in student achievement in the KCMSD, see *supra*, at 141–142. Moreover, while the Court repeatedly describes the magnet school program as looking beyond the boundaries of the district, the program is primarily aimed not at drawing back white children whose parents have moved to another district, but rather at drawing back children who attend private schools while living within the geographical confines of the KCMSD, whose population remains majority white, *Jenkins* v. *Missouri*, 855 F. 2d 1295, 1302–1303 (CA8 1988). See 1 App. 132 (Order of Nov. 12, 1986) ("Most importantly, the Court believes that the proposed magnet plan is so attractive that it would draw non-minority students from the private schools who have abandoned or avoided the KCMSD, and draw in additional non-minority students from the suburbs"). As such, a substantial impetus for the District Court's remedy does not consider the world beyond district boundaries at all, and much of the Court's opinion is of little significance to the case before it.

was not so in fact, there is at least enough in the record to cast serious doubt on its assumption. Second, the Court violates existing case law even on its own apparent view of the facts, that the segregation violation within the KCMSD produced no proven effects, segregative or otherwise, outside it. Assuming this to be true, the Court's decision that the rule against interdistrict remedies for intradistrict violations applies to this case, solely because the remedy here is meant to produce effects outside the district in which the violation occurred, is flatly contrary to established precedent.

A

The Court appears to assume that the effects of segregation were wholly contained within the KCMSD, and based on this assumption argues that any remedy looking beyond the district's boundaries is forbidden. The Court's position rests on the premise that the District Court and the Court of Appeals erred in finding that segregation had produced effects outside the district, and hence were in error when they treated the reversal of those effects as a proper subject of the equitable power to eliminate the remaining vestiges of the old segregation so far as practicable.

The Court has not shown the trial court and the Eighth Circuit to be wrong on the facts, however, and on the record before us this Court's factual assumption is at the very least a questionable basis for removing one major foundation of the desegregation decree. I do not, of course, claim to be in a position to say for sure that the Court is wrong, for I, like the Court, am a victim of an approach to the case uninformed by any warning that a foundational issue would be dispositive. My sole point is that the Court is not in any obvious sense correct, wherever the truth may ultimately lie.

To be sure, the District Court found, and the Court of Appeals affirmed, that the suburban school districts (SSD's) had taken no action contributing to segregation in the KCMSD. *Jenkins* v. *Missouri*, 807 F. 2d 657, 664, 668–670 (CA8 1986);

3 App. 723, 738 (Order of June 5, 1984). Those courts further concluded that the constitutional violations committed by the State and the KCMSD had not produced any significant segregative effects in the SSD's, all of which have operated as unitary districts since shortly after our decision in *Brown*. *Jenkins*, 807 F. 2d, at 672, 678; 3 App. 813, 816. It was indeed on the basis of just these findings that the District Court concluded that it was dealing with an intradistrict violation, and, consistently with our decision in *Milliken I*, refused to consolidate the SSD's with the KCMSD. *Jenkins*, 807 F. 2d, at 660–661, 674; 3 App. 721–723, 725, 810–811.

There is no inconsistency between these findings and the possibility, however, that the actions of the State and the KCMSD produced significant nonsegregative effects outside the KCMSD that led to greater segregation within it. To the contrary, the District Court and the Court of Appeals concurred in finding that "the preponderance of black students in the [KCMSD] was due to the State and KCMSD's constitutional violations, which caused white flight. . . . [T]he existence of segregated schools led to white flight from the KCMSD to suburban districts and to private schools." *Jenkins*, 855 F. 2d, at 1302, citing the District Court's Order of Aug. 25, 1986, 1 App. 126 ("[S]egregated schools, a constitutional violation, ha[ve] led to white flight from the KCMSD to suburban districts [and] large numbers of students leaving the schools of Kansas City and attending private schools . . ."). While this exodus of white students would not have led to segregation within the SSD's, which have all been run in a unitary fashion since the time of *Brown*, it clearly represented an effect spanning district borders, and one which the District Court and the Court of Appeals expressly attributed to segregation in the KCMSD.

The Court, however, rejects the findings of the District Court, endorsed by the Court of Appeals, that segregation led to white flight from the KCMSD, and does so at the ex-

pense of another accepted norm of our appellate procedure. We have long adhered to the view that "[a] court of law, such as this Court is, rather than a court for correction of errors in factfinding, cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error." *Graver Tank & Mfg. Co.* v. *Linde Air Products Co.,* 336 U. S. 271, 275 (1949); see also *Branti* v. *Finkel,* 445 U. S. 507, 512, n. 6 (1980) (referring to "our settled practice of accepting, absent the most exceptional circumstances, factual determinations in which the district court and the court of appeals have concurred"). The Court fails to show any exceptional circumstance present here, however: it relies on a "contradiction" that is not an obvious contradiction at all, and on an arbitrary "supposition" that " 'white flight' may result from desegregation, not *de jure* segregation," *ante,* at 95, a supposition said to be bolstered by the District Court's statement that there was "an abundance of evidence that many residents of the KCMSD left the district and moved to the suburbs because of the district's efforts to integrate its schools." 672 F. Supp., at 412.[5]

The doubtful contradiction is said to exist between the District Court's findings, on the one hand, that segregation caused white flight to the SSD's, and the Court of Appeals's conclusion, on the other, that the District Court " 'made specific findings that negate current significant interdistrict effects . . . .' " *Ante,* at 96, quoting *Jenkins,* 807 F. 2d, at 672. Any impression of contradiction quickly disappears, however, when the Court of Appeals's statement is read in context:

> "[T]he [district] court explicitly recognized that [to consolidate school districts] under *Milliken [I]* 'there

---

[5] JUSTICE O'CONNOR also rests on supposition. See *ante,* at 113 ("In this case, it may be the 'myriad factors of human existence,' that have prompted the white exodus from the KCMSD . . .") (citation omitted).

must be evidence of a constitutional violation in one district that produces a significant segregative effect in another district.' Order of June 5, 1984 at 14, 95. . . . The district court thus dealt not only with the issue of whether the SSDs were constitutional violators but also whether there were significant interdistrict segregative effects. *See* V, *infra.* When it did so, it made specific findings that negate current significant interdistrict effects . . . ." *Ibid.*

It is clear that, in this passage, the Court of Appeals was summarizing the District Court's findings that the constitutional violations within the KCMSD had not produced any segregative effects in other districts. *Ibid.* While the Court of Appeals did not repeat the word "segregative" in its concluding sentence, there is nothing to indicate that it was referring to anything but segregative effects, and there is in fact nothing in the District Court's own statements going beyond its finding that the State and the KCMSD's actions did not lead to segregative effects in the SSD's.[6]

---

[6] The Court states that the Court of Appeals would not have decided the question whether the State and the KCMSD's violations produced segregative effects in the SSD's, as respondents lacked standing to raise the issue. *Ante,* at 96, n. 9. This statement eludes explanation. In *Milliken I,* 418 U. S. 717 (1974), we held that before a district court may order the mandatory interdistrict reassignment of students throughout a metropolitan area, it must first find either that multiple school districts participated in the unconstitutional segregation of students, or that the violation within a single school district "produce[d] . . . significant segregative effect[s]" in the others. *Id.,* at 744–745. See *ante,* at 93; *ante,* at 105, 108 (O'CONNOR, J., concurring); see also *infra,* at 170–171. In the earlier stages of this litigation, the Jenkins respondents sought the mandatory reassignment of students throughout the Kansas City metropolitan area, and the District Court, 3 App. 721–820 (Order of June 5, 1984), and the Court of Appeals, *Jenkins,* 807 F. 2d, at 665–666, 672, rejected such relief on the grounds that the requirements of *Milliken I* had not been satisfied. The Court is now saying that respondents lacked standing to raise the issue of interdistrict segregative effects, and that the District Court and

164

There is, in turn, no contradiction between this finding and the District Court's findings about white flight: while white flight would have produced significant effects in other school districts, in the form of greatly increased numbers of white students, those effects would not have been segregative beyond the KCMSD, as the departing students were absorbed into wholly unitary systems.

Without the contradiction, the Court has nothing to justify its rejection of the District Court's finding that segregation caused white flight but its supposition that flight results from integration, not segregation. The supposition, and the distinction on which it rests, are untenable. At the more obvious level, there is in fact no break in the chain of causation linking the effects of desegregation with those of segregation. There would be no desegregation orders and no remedial plans without prior unconstitutional segregation as the occasion for issuing and adopting them, and an adverse reaction to a desegregation order is traceable in fact to the segregation that is subject to the remedy. When the Court quotes the District Court's reference to abundant evidence that integration caused flight to the suburbs, then, it quotes nothing inconsistent with the District Court's other findings that segregation had caused the flight. The only difference between the statements lies in the point to which the District Court happened to trace the causal sequence.

The unreality of the Court's categorical distinction can be illustrated by some examples. There is no dispute that before the District Court's remedial plan was placed into effect the schools in the unreformed segregated system were physically a shambles:

> "The KCMSD facilities still have numerous health and safety hazards, educational environment hazards, functional impairments, and appearance impairments. The

---

the Court of Appeals lacked the authority to reach the issue, even though that is precisely what was required of them under *Milliken I*.

specific problems include: inadequate lighting; peeling paint and crumbling plaster on ceilings, walls and corridors; loose tiles, torn floor coverings; odors resulting from unventilated restrooms with rotted, corroded toilet fixtures; noisy classrooms due to lack of adequate acoustical treatment; lack of off street parking and bus loading for parents, teachers and students; lack of appropriate space for many cafeterias, libraries, and classrooms; faulty and antiquated heating and electrical systems; damaged and inoperable lockers; and inadequate fire safety systems. The conditions at Paseo High School are such that even the principal stated that he would not send his own child to that facility." 672 F. Supp., at 403 (citations omitted).

See also *Jenkins*, 855 F. 2d, at 1300 (reciting District Court findings); *Jenkins*, 639 F. Supp., at 39–40. The cost of turning this shambles into habitable schools was enormous, as anyone would have seen long before the District Court ordered repairs. See *Missouri* v. *Jenkins*, 495 U. S., at 38–40 (discussing the costs of the remedial program and the resulting increases in tax rates within the KCMSD). Property tax-paying parents of white children, seeing the handwriting on the wall in 1985, could well have decided that the inevitable cost of cleanup would produce an intolerable tax rate and could have moved to escape it. The District Court's remedial orders had not yet been put in place. Was the white flight caused by segregation or desegregation? The distinction has no significance.

Another example makes the same point. After *Brown*, white parents likely came to understand that the practice of spending more on white schools than on black ones would be stopped at some point. If they were unwilling to raise all expenditures to match the customary white school level, they must have expected the expenditures on white schools to drop to the level of those for the segregated black schools or to some level in between. See, *e. g.*, 639 F. Supp., at 39–40

(describing a decline in all 68 of the KCMSD's school build-ings in the past "10 to 15 years").   If they thus believed that the white schools would deteriorate they might then have taken steps to establish private white schools, starting a practice of local private education that has endured.   Again, what sense does it make to say of this example that the cause of white private education was desegregation (not yet under-way), rather than the segregation that led to it?

I do not claim that either of these possible explanations would ultimately turn out to be correct, for any such claim would head me down the same road the Court is taking, of resolving factual issues independently of the trial court with-out warning the respondents that the full evidentiary record bearing on the issue should be identified for us.   My point is only that the Court is on shaky grounds when it assumes that prior segregation and later desegregation are separable in fact as causes of "white flight," that the flight can plausibly be said to result from desegregation alone, and that there-fore as a matter of fact the "intradistrict" segregation viola-tion lacked the relevant consequences outside the district re-quired to justify the District Court's magnet concept.   With the arguable plausibility of each of these assumptions seri-ously in question, it is simply rash to reverse the concurrent factual findings of the District Court and the Court of Ap-peals.   All the judges who spoke to the issue below con-cluded that segregated schooling in the KCMSD contributed to the exodus of white students from the district.   Among them were not only the judges most familiar with the record of this litigation, Judge Clark of the District Court and the three members of the Court of Appeals panel that has re-tained jurisdiction over the case, see *supra*, at 162–164, but also the five judges who dissented from the denial of rehear-ing en banc in the Court of Appeals (whose opinion the ma-jority does not hesitate to rely on for other purposes):

> "[By 1985], '[w]hite flight' to private schools and to the suburbs was rampant.

"The district court, correctly recognizing that at least part of this problem was the consequence of the de jure segregation previously practiced under Missouri constitutional and statutory law, fashioned a remedial plan for the desegregation of the KCMSD . . . ." 19 F. 3d, at 397 (Beam, J., dissenting from denial of rehearing en banc).

The reality is that the Court today overturns the concurrent factual findings of the District Court and the Court of Appeals without having identified any circumstance in the record sufficient to warrant such an extraordinary course of action.

B

To the substantial likelihood that the Court proceeds on erroneous assumptions of fact must be added corresponding errors of law. We have most recently summed up the obligation to correct the condition of *de jure* segregation by saying that "the duty of a former *de jure* district is to 'take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.'" *Freeman*, 503 U. S., at 486, quoting *Green*, 391 U. S., at 437–438. Although the fashioning of judicial remedies to this end has been left, in the first instance, to the equitable discretion of the district courts, in *Milliken I* we established an absolute limitation on this exercise of equitable authority. "[W]ithout an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy." *Milliken I*, 418 U. S., at 745.

The Court proceeds as if there is no question but that this proscription applies to this case. But the proscription does not apply. We are not dealing here with an interdistrict remedy in the sense that *Milliken I* used the term. In the *Milliken I* litigation, the District Court had ordered 53 surrounding school districts to be consolidated with the Detroit

school system, and mandatory busing to be started within the enlarged district, even though the court had not found that any of the suburban districts had acted in violation of the Constitution. "The metropolitan remedy would require, in effect, consolidation of 54 independent school districts historically administered as separate units into a vast new super school district." *Id.*, at 743. It was this imposition of remedial measures on more than the one wrongdoing school district that we termed an "interdistrict remedy":

> "We . . . turn to address, for the first time, the validity of a remedy mandating cross-district or interdistrict consolidation to remedy a condition of segregation found to exist in only one district." *Id.*, at 744.

And it was just this subjection to court order of school districts not shown to have violated the Constitution that we deemed to be in error:

> "Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. . . .
>
> ". . . To approve the remedy ordered by the court would impose on the outlying districts, not shown to have committed any constitutional violation, a wholly impermissible remedy based on a standard not hinted at in *Brown I* and *II* or any holding of this Court." *Id.*, at 744–745.

We did not hold, however, that any remedy that takes into account conditions outside of the district in which a constitutional violation has been committed is an "interdistrict remedy," and as such improper in the absence of an "interdistrict violation." To the contrary, by emphasizing that remedies in school desegregation cases are grounded in traditional eq-

uitable principles, *id.*, at 737–738, we left open the possibility that a district court might subject a proven constitutional wrongdoer to a remedy with intended effects going beyond the district of the wrongdoer's violation, when such a remedy is necessary to redress the harms flowing from the constitutional violation.

The Court, nonetheless, reads *Milliken I* quite differently. It reads the case as categorically forbidding imposition of a remedy on a guilty district with intended consequences in a neighboring innocent district, unless the constitutional violation yielded segregative effects in that innocent district. See, *e. g., ante,* at 92 ("But this interdistrict goal [of attracting nonminority students from outside the KCMSD schools] is beyond the scope of the intradistrict violation identified by the District Court" (emphasis deleted)).

Today's decision therefore amounts to a redefinition of the terms of *Milliken I* and consequently to a substantial expansion of its limitation on the permissible remedies for prior segregation. But that is not the only prior law affected by today's decision. The Court has not only rewritten *Milliken I;* it has effectively overruled a subsequent case expressly refusing to constrain remedial equity powers to the extent the Court does today, and holding that courts ordering relief from unconstitutional segregation may, with an appropriate factual predicate, exercise just the authority that the Court today eliminates.

Two Terms after *Milliken,* we decided *Hills* v. *Gautreaux,* 425 U. S. 284 (1976), in a unanimous opinion by Justice Stewart. The District Court in *Gautreaux* had found that the United States Department of Housing and Urban Development (HUD) and the Chicago Housing Authority (CHA) had maintained a racially segregated system of public housing within the city of Chicago, in violation of various constitutional and statutory provisions. There was no indication that the violation had produced any effects outside the city itself. The issue before us was whether "the remedial order

of the federal trial court [might] extend beyond Chicago's territorial boundaries." *Id.*, at 286. Thus, while JUSTICE O'CONNOR suggests that *Gautreaux* may not have addressed the propriety of a remedy with effects going beyond the district in which the constitutional violation had occurred, *ante*, at 106, her suggestion cannot be squared with our express understanding of the question we were deciding: "the permissibility in light of *Milliken* of 'inter-district relief for discrimination in public housing in the absence of a finding of an inter-district violation.'" *Gautreaux, supra*, at 292.

HUD argued that the case should turn on the same principles governing school desegregation orders and that, under *Milliken I*, the District Court's order could not look beyond Chicago's city limits, because it was only within those limits that the constitutional violation had been committed. 425 U. S., at 296–297. We agreed with HUD that the principles of *Milliken* apply outside of the school desegregation context, 425 U. S., at 294, and n. 11, but squarely rejected its restricted interpretation of those principles and its view of limited equitable authority to remedy segregation. We held that a district court may indeed subject a governmental perpetrator of segregative practices to an order for relief with intended consequences beyond the perpetrator's own subdivision, even in the absence of effects outside that subdivision, so long as the decree does not bind the authorities of other governmental units that are free of violations and segregative effects:

> "[*Milliken*'s] holding that there had to be an interdistrict violation or effect before a federal court could order the crossing of district boundary lines reflected the substantive impact of a consolidation remedy on separate and independent school districts. The District Court's desegregation order in *Milliken* was held to be an impermissible remedy not because it envisioned relief against a wrongdoer extending beyond the city in which the violation occurred but because it contemplated a

judicial decree restructuring the operation of local governmental entities that were not implicated in any constitutional violation." *Id.*, at 296 (footnote omitted).

In the face of *Gautreaux*'s language, the Court claims that it was only because the "'relevant geographic area for purposes of the [plaintiffs'] housing options [was] the Chicago housing market, not the Chicago city limits,'" *ante*, at 97, quoting *Gautreaux*, *supra*, at 299, that we held that "'a metropolitan area remedy . . . [was] not impermissible as a matter of law,'" *ante*, at 97, quoting *Gautreaux*, *supra*, at 306. See also *ante*, at 106 (O'CONNOR, J., concurring). But that was only half the explanation. Requiring a remedy outside the city in the wider metropolitan area was permissible not only because that was the area of the housing market even for people who lived within the city (thus relating the scope of the remedy to the violation suffered by the victims) but also because the trial court could order a remedy in that market without binding a governmental unit innocent of the violation and free of its effects. In "reject[ing] the contention that, since HUD's constitutional and statutory violations were committed in Chicago, *Milliken* precludes an order against HUD that will affect its conduct in the greater metropolitan area," we stated plainly that "[t]he critical distinction between HUD and the suburban school districts in *Milliken* is that HUD has been found to have violated the Constitution. That violation provided the necessary predicate for the entry of a remedial order against HUD and, indeed, imposed a duty on the District Court to grant appropriate relief." *Gautreaux*, 425 U. S., at 297. Having found HUD in violation of the Constitution, the District Court was obligated to make "every effort . . . to employ those methods [necessary] 'to achieve the greatest possible degree of [relief], taking into account the practicalities of the situation,'" *ibid.*, quoting *Davis* v. *Board of School Comm'rs of Mobile Cty.*, 402 U. S. 33, 37 (1971), and the District Court's methods could include subjecting HUD to measures going beyond the

geographical or political boundaries of its violation. "Nothing in the *Milliken* decision suggests a *per se* rule that federal courts lack authority to order parties found to have violated the Constitution to undertake remedial efforts beyond the municipal boundaries of the city where the violation occurred." 425 U. S., at 298.

On its face, the District Court's magnet school concept falls entirely within the scope of equitable authority recognized in *Gautreaux*. In *Gautreaux*, the fact that the CHA and HUD had the authority to operate outside the limits of the city of Chicago meant that an order to fund or build housing beyond those limits would "not necessarily entail coercion of uninvolved governmental units . . . ." *Id.*, at 298. Here, by the same token, the District Court has not sought to "consolidate or in any way restructure" the SSD's, *id.*, at 305–306, or, indeed, to subject them to any remedial obligation at all.[7] The District Court's remedial measures go only to the operation and quality of schools within the KCMSD, and the burden of those measures accordingly falls only on the two proven constitutional wrongdoers in this case, the KCMSD and the State. And insofar as the District Court has ordered those violators to undertake measures to increase the KCMSD's attractiveness to students from other districts and thereby to reverse the flight attributable to their prior segregative acts, its orders do not represent an abuse of discretion, but instead appear "wholly commensurate with the 'nature and extent of the constitutional violation.'" *Id.*, at 300, quoting *Milliken I*, 418 U. S., at 744.

The Court's failure to give *Gautreaux* its due points up the risks of its approach to this case. The major peril of addressing an important and complex question without ade-

---

[7] Thus, the Court errs in suggesting that the District Court has sought to do here indirectly what we held the District Court could not do directly in *Milliken I*. *Ante*, at 94. The District Court here has not attempted, directly or indirectly, to impose any remedial measures on school districts innocent of a constitutional violation or free from its segregative effects.

quate notice to the parties is the virtual certainty that briefing and argument will not go to the real point. If respondents had had reason to suspect that the validity of applying the District Court's remedial concept of magnet schools in this case would be the focus of consideration by this Court, they presumably would have devoted significant attention to *Gautreaux* in their briefing. As things stand, the only references to the case in the parties' briefs were two mere passing mentions by the *Jenkins* respondents and a footnote by the State implying that *Gautreaux* was of little relevance here. The State's footnote says that "in *Gautreaux*, there was evidence of suburban discrimination and of the 'extra-city impact of [HUD's] intracity discrimination.'" Brief for Petitioners 28, n. 18. That statement, however, is flatly at odds with Justice Stewart's opinion for the Court: "the Court of Appeals surmised that either an interdistrict violation or an interdistrict segregative effect may have been present in this case. There is no support provided for either conclusion. . . . [I]t is apparent that the Court of Appeals was mistaken in supposing that the [record contains] evidence of suburban discrimination justifying metropolitan area relief. . . . [And the Court of Appeals's] unsupported speculation falls far short of the demonstration of a 'significant segregative effect in another district' discussed in the *Milliken* opinion." *Gautreaux*, 425 U. S., at 294–295, n. 11.[8]

---

[8] JUSTICE O'CONNOR thinks I place undue emphasis on the *Gautreaux* Court's footnote, turning it into an "island, entire of itself . . . ," *ante*, at 107, but it cannot be shrunk to the dimension necessary to support the majority's result. According to JUSTICE O'CONNOR, *Gautreaux* holds that "territorial transgression" of any kind "is permissible only upon a showing that [an] intradistrict constitutional violation [has] produced significant interdistrict segregative effects. . . ." *Ante*, at 106. She finds *Gautreaux* significant only in reversing the Court of Appeals's finding that such effects had been established on the record of that case, and she understands that the Court remanded the case to the District Court with the understanding that it would order relief going beyond the city of Chicago's

After being misrepresented by the State and mentioned only briefly by the other parties, *Gautreaux*'s holding is now effectively overruled, for the Court's opinion can be viewed as correct only on that assumption. But there is no apparent reason to reverse that decision, which represented the judgment of a unanimous Court, seems to reflect equitable common sense, and has been in the reports for two decades. While I would reserve final judgment on *Gautreaux*'s future until a time when the subject has been given a full hearing,

---

boundaries only if it found significant interdistrict segregative effects to exist. *Ante*, at 107–108.

But this is an implausible reading. JUSTICE O'CONNOR is correct that in *Gautreaux* we reiterated the importance of *Milliken I*'s requirement of significant interdistrict segregative effects, but we did so only in connection with the type of relief at issue in *Milliken I*, that involving "direct federal judicial interference with local governmental entities" not shown to have violated the Constitution. *Gautreaux*, 425 U. S., at 294; see generally *id.*, at 292–298. As the language I have quoted above demonstrates, we made it very clear in *Gautreaux* that the District Court could order relief going beyond the boundaries of the city of Chicago without any finding of such effects, because that relief would impose no obligation on governmental units innocent of a constitutional violation and free of its effects. Indeed, when we summarized our holding at the conclusion of our opinion, we made the point yet again. "In sum, there is no basis for the petitioner's claim that court-ordered metropolitan area relief in this case would be impermissible as a matter of law under the *Milliken* decision. In contrast to the desegregation order in that case, a metropolitan area relief order directed to HUD would not consolidate or in any way restructure local governmental units." *Id.*, at 305–306. While JUSTICE O'CONNOR, *ante*, at 107–108 (and the Court, *ante*, at 97) seeks to make much of the fact that we did not order metropolitan relief ourselves in *Gautreaux*, but rather remanded the case to the District Court, we did so because we recognized that the question of what relief to order was a matter for the District Court in the first instance. "The nature and scope of the remedial decree to be entered on remand is a matter for the District Court in the exercise of its equitable discretion, after affording the parties an opportunity to present their views." 425 U. S., at 306. Nowhere did we state that before the District Court could order metropolitan area relief, it would first have to make findings of significant segregative effects extending beyond the city of Chicago's borders.

I realize that after today's decision there may never be an occasion for any serious examination of *Gautreaux*. If things work out that way, there will doubtless be those who will quote from *Gautreaux* to describe today's opinion as "transform[ing] *Milliken*'s principled limitation on the exercise of federal judicial authority into an arbitrary and mechanical shield for those found to have engaged in unconstitutional conduct." *Id.*, at 300.

I respectfully dissent.

JUSTICE GINSBURG, dissenting.

I join JUSTICE SOUTER's illuminating dissent and emphasize a consideration key to this controversy.

The Court stresses that the present remedial programs have been in place for seven years. *Ante*, at 102. But compared to more than two centuries of firmly entrenched official discrimination, the experience with the desegregation remedies ordered by the District Court has been evanescent.

In 1724, Louis XV of France issued the Code Noir, the first slave code for the Colony of Louisiana, an area that included Missouri. Violette, The Black Code in Missouri, in 6 Proceedings of the Mississippi Valley Historical Association 287, 288. (B. Shambaugh ed. 1913). When Missouri entered the Union in 1821, it entered as a slave State. *Id.*, at 303.

Before the Civil War, Missouri law prohibited the creation or maintenance of schools for educating blacks: "No person shall keep or teach any school for the instruction of negroes or mulattoes, in reading or writing, in this State." Act of Feb. 16, 1847, § 1, 1847 Mo. Laws 103.

Beginning in 1865, Missouri passed a series of laws requiring separate public schools for blacks. See, *e. g.*, Act of Mar. 29, 1866, § 20, 1865 Mo. Laws 177. The Missouri Constitution first permitted, then required, separate schools. See Mo. Const., Art. IX, § 2 (1865); Mo. Const., Art. XI, § 3 (1875).

After this Court announced its decision in *Brown* v. *Board of Education*, 347 U. S. 483 (1954), Missouri's Attorney Gen-

eral declared these provisions mandating segregated schools unenforceable. See *Jenkins* v. *Missouri*, 593 F. Supp. 1485, 1490 (WD Mo. 1984). The statutes were repealed in 1957 and the constitutional provision was rescinded in 1976. *Ibid.* Nonetheless, 30 years after *Brown*, the District Court found that "the inferior education indigenous of the state-compelled dual school system has lingering effects in the Kansas City, Missouri School District." 593 F. Supp., at 1492. The District Court concluded that "the State . . . cannot defend its failure to affirmatively act to eliminate the structure and effects of its past dual system on the basis of restrictive state law." *Id.*, at 1505. Just ten years ago, in June 1985, the District Court issued its first remedial order. *Jenkins* v. *Missouri*, 639 F. Supp. 19 (WD Mo.).

Today, the Court declares illegitimate the goal of attracting nonminority students to the Kansas City, Missouri, School District, *ante*, at 94, and thus stops the District Court's efforts to integrate a school district that was, in the 1984/1985 school year, sorely in need and 68.3% black. 639 F. Supp., at 36; see also *Jenkins* v. *Missouri*, 672 F. Supp. 400, 411 (WD Mo. 1987) (reporting that physical facilities in the School District had "literally rotted"). Given the deep, inglorious history of segregation in Missouri, to curtail desegregation at this time and in this manner is an action at once too swift and too soon. Cf. 11 F. 3d 755, 762 (CA8 1993) (Court of Appeals noted with approval that the District Court had ordered the School District to submit plans projecting termination of court-ordered funding at alternative intervals, running from April 1993, of three, five, seven, or, at most, ten years).